# CUMMING *v.* RICHMOND COUNTY BOARD OF EDUCATION.

### ERROR TO THE SUPERIOR COURT OF RICHMOND COUNTY, GEORGIA.

No. 164. Argued October 30, 1899.— Decided December 18, 1899.

The plaintiffs in error complained that the Board of Education used the funds in its hands to assist in maintaining a high school for white children, without providing a similar school for colored children. The substantial relief asked for was an injunction. The state court did not deem the action of the Board of Education in suspending temporarily and for economic reasons the high school for colored children a sufficient reason why the defendant should be restrained by injunction from maintaining an existing high school for white children. It rejected the suggestion that the Board proceeded in bad faith or had abused the discretion with which it was invested by the statute under which it proceeded, or had

acted in hostility to the colored race. *Held* that under the circumstances disclosed, this court could not say that this action of the state court was, within the meaning of the Fourteenth Amendment, a denial by the State to the plaintiffs and to those associated with them, of the equal protection of the laws, or of any privileges belonging to them as citizens, of the United States.

While all admit that the benefits and burdens of public taxation must be shared by citizens without discrimination against any class on account of their race, the education of the people in schools maintained by state taxation is a matter belonging to the respective States, and any interference on the part of Federal authority with the management of such schools cannot be justified except in the case of a clear and unmistakable disregard of rights secured by the supreme law of the land.

THE plaintiffs in error, Cumming, Harper and Ladeveze, citizens of Georgia and persons of color suing on behalf of themselves and all others in like case joining with them, brought this action against the Board of Education of Richmond County and Charles S. Bohler, tax collector.

In the petition filed by them it was alleged —

That the plaintiffs were residents, property owners and taxpayers of Richmond County, the defendant Board being a corporation created under an act of the General Assembly of Georgia of August 23, 1872, regulating public instruction in that county, empowering the Board to annually levy such tax as it deemed necessary for public school purposes;

That on the 10th of July, 1897, the Board levied for that year for the support of primary, intermediate, grammar and high schools in the county, a tax of $45,000, which was then due and being collected;

That the petitioners interposed no objections to so much of the tax as was for primary, intermediate and grammar schools, but the tax for the support of the system of high schools was illegal and void for the reason that that system was for the use and benefit of the white population exclusively;

That the Board was not authorized by law to levy any tax for the support of a system of high schools in which the colored school population of the county were not given the same educational facilities as were furnished the white school population;

That at least $4500 of the tax of $45,000 was being col-

lected and when collected would be used for the support of such system of high schools;

That the Board had on hand the sum of $20,000 or other large sum, the proceeds of prior tax levies, in trust to disburse solely for legal educational purposes in the county, and would receive from the tax levy of 1897 and from other sources large sums in like trust, and that it was the owner and had the custody and control of school fixtures, furniture, educational equipments and appliances generally, holding the same in like trust; and,

That although the Board was not authorized by law to use any part of such funds or property for the support and maintenance of a system of high schools in which the colored school population were not given the same educational facilities as were furnished for the white school population, it was using such funds and property in the support and maintenance of its existing high school system, the educational advantages of which were restricted wholly to the benefit of the white school population of Richmond County to the entire exclusion of the colored school population, and that by such use of those funds and property a deficiency for educational purposes would inevitably result, to make which good additional taxation would be required.

. The petitioners also alleged that they were persons of color and parents of children of school age lawfully entitled to the full benefit of any system of high schools organized or maintained by the Board; that up to the time of the said tax levy and for many years continuously prior thereto, the Board maintained a system of high schools in Richmond County in which the colored school population had the same educational advantages as the white school population, but on July 10, 1897, it withdrew from and denied to the colored school population any participation in the educational facilities of a high school system in the county and had voted to continue to deny to that population any admission to or participation in such educational facilities; and that at the time of such withdrawal and denial the petitioners respectively had children attending the colored high school then existing, but who were

now debarred from participation in the benefits of a public high school education though petitioners were being taxed therefor. They averred that the action of the Board of Education was a denial of the equal protection of the laws secured by the Constitution of the United States, and that it was inequitable, illegal and unconstitutional for the Board to levy upon or for the tax collector to collect from them any tax for the educational purposes of the county, from the benefits of which the petitioners in the persons of their children of school age were excluded and debarred.

The petitioners prayed that the tax collector Bohler be enjoined from collecting so much of the tax levy of July 10, 1897, as had been levied for the support of said system of high schools; that the Board be enjoined from using any funds or property then held by it or thereafter to come into its hands for educational purposes in the county for the support, maintenance or operation of that system; and that they have such other and further relief as was equitable and just.

The Board of Education demurred to the petition and also filed an answer. It denied that it had established any system of high schools in the county, and averred that it was neither its duty nor had it authority to establish such a system, although it had authority in its discretion to establish high schools at such points in the county as the interest or convenience of the people required; that in pursuance of such authority it had established the Neely High School in 1876, but in 1878 its name was changed to that of the Tubman High School, when Mrs. Emily H. Tubman presented to the Board a large lot and building for the purpose of affording a higher education to the young women of the county, the Richmond Academy affording this benefit and advantage to the male sex; that the demand was urgent for the continuance of the Tubman school by the Board, and it was so accordingly determined, each pupil paying fifteen dollars for tuition per annum and non-residents of the county forty dollars, which was the charge made by the Richmond Academy for Boys; and that the property, the value of which with the fixtures, furniture and appliances was worth not less than $30,000, was

donated by Mrs. Tubman upon the express condition that in the event the Board failed to use the building for a high school the same was to enure instantly to the benefit of the Richmond Academy and the Augusta Free School;

That in June, 1876, the Board deemed it wise to give its assistance to the Hephzibah High School, conducted and controlled by the Hephzibah Baptist Association in the village of Hephzibah in the southeastern part of the county, charging and receiving for high school scholars the sum of fifteen dollars per annum;

That, in 1880, there being no high school in the county for the colored race, the funds of the Board justifying it, and other schools of lower grade having been established by the local trustees in Augusta sufficient to accommodate the colored children, the Board deemed it wise and proper to establish the Ware High School, charging for each pupil taught therein ten dollars per annum; and

That in June, 1897, a special committee appointed by the Board investigated the status of the high schools in the county and ascertained the condition of each, and the committee recommended that, for "purely economic reasons in the education of the negro race," the Ware High School be discontinued and the City Conference Board requested to open four primary schools in the same building at a cost of about $200 each for the accommodation of those negro children who were annually denied admittance to the schools.

The answer of the Board further stated: "Touching the Ware High School, its friends and the colored patrons thereof were called before the committee, and were heard by the committee with every respect and consideration. They were told the reasons that controlled the committee in its intention to recommend its discontinuance for the present. These were: Because four hundred or more of negro children were being turned away from the primary grades unable to be provided with seats or teachers; because the same means and the same building which were used to teach sixty high school pupils would accommodate two hundred pupils in the rudiments of education; because the Board at this time was not finan-

cially able to erect buildings and employ additional teachers for the large number of colored children who were in need of primary education, and because there were in the city of Augusta at this time three public high schools — the Haines Industrial School, the Walker Baptist Institute and the Payne Institute — each of which were public to the colored people and were charging fees no larger than the Board charged for pupilage in the Ware High School." After stating that the action of the special committee was approved by the Board, the answer continued: "At the same time when the vote was taken on the report of the Ware High School it was unanimously resolved that the Board of Education reinstate the said school whenever in their judgment the Board could afford it. Subsequently to the Board's temporary suspension of the Ware High School a number of colored people petitioned the Board for rescission of this action, among whom were the complainants herein. A full Board was called and convened on the — day of August, and the petitioners were heard and their request fully considered. The Board, after a session and deliberation of over two hours, refused to rescind for the reasons heretofore set out, and said that in their view, until the local trustees — *i.e.* the City Conference Board — should have furnished a sufficiency of primary schools for the colored population it would be unwise and unconscionable to keep up a high school for sixty pupils and turn away three hundred little negroes who are asking to be taught their alphabet and to read and write. No part of the funds of this Board accrued or accruing and no property appropriated to the education of the negro race has been taken from them. This Board has only applied the same means and the same moneys from one grade of their education to another grade; and in this connection defendant says that the enrolment in the colored school is this year 238 more than the last, the Ware High School building accommodating 188 pupils."

The answer of the Board, referring to the act of 1872, averred that "section 9 of said act commands the local trustees to provide the same facilities to each race as regards school houses and fixtures, attainments and abilities of teachers

and length of term, but that this section refers only to the schools established by the trustees of each school district under section 6 of said act, and does not apply to schools of higher grade; that section 10 of said act, which empowers this respondent to establish schools of higher grade than those established by the local trustees, ordains their establishment to such as the interest and convenience of the people may in the judgment of this Board require. It admits that on the 10th day of July last it suspended the Ware High School for the reason that in its judgment the interest and convenience of the people did not require it, and that it caused to be established in its stead three primary schools for colored children, and for reasons heretofore in its answer set forth. Whether or not the petitioners at the time of said suspension had children attending the Ware High School this defendant is not advised, but denies that they are debarred from a high school education in this community, since for the same charges as were made by this Board for pupilage in the Ware High School they can find this education in three other colored high schools open to the public in the city of Augusta. Defendants deny the allegations specially pleading that the acts of 1872 and 1877 deny to the colored race equal protection of the law, or that the course and conduct of this Board thereunder is obnoxious to this constitutional inhibition."

The plaintiffs amended their petition, alleging: "1st. That 'the Payne Institute,' 'the Walker Baptist Institute,' and 'the Haines Normal and Industrial Institute' mentioned in said answer, are purely private and pay educational institutions under sectarian control, and have been in existence for years past and have no connection and never have had any connection whatsoever with the public school system conducted by said Board. 2d. That said Board has no legal right to charge for extending a public high school education to the children of school age of actual residents of said county. 3d. That if a deficiency of means exists for extending a public primary school education to the colored school population of the city of Augusta in said county, said deficiency is due to the illegal action of said Board in appropriating to the white

school population of said city largely more of the public school fund than it is legally entitled to, to the corresponding detriment of the colored school population of said city, and but for such illegal action there would be no such deficiency as said Board avers."

In answer to this amended petition, the Board admitted that the Payne Institute, the Walker Baptist Institute, and the Haines Normal and Industrial Institute mentioned in its answer were private educational institutions under sectarian control and had no connection with the public school system, conducted by the defendant Board. But it averred that the impression sought to be conveyed that there was sectarian, denominational teaching in those schools was untrue; that the schools referred to were open to the public generally, and any child of sufficient scholarship and moral character could enter them, whatever his or her religious belief. The Board also asserted its right to charge for tuition in high schools, and denied that any deficiency of means for extending a public primary school education to the colored school population was due to any action it had taken.

The defendant Bohler, the tax collector, demurred to the petition and also filed an answer.

The cause having been heard upon the demurrers and pleadings, the court sustained the demurrer of defendant Bohler, and refused to grant any injunction against him as tax collector. But the demurrer of the Board of Education was overruled, and an order was entered restraining the Board from using "any funds or property now in or hereafter coming into its hands for educational purposes in said county for the support, maintenance or operation of any white high school in said county until said Board shall provide or establish equal facilities in high school education as are now maintained by them for white children for such colored children of high school grade in said county as may desire a high school education or until the further order of the court." This order was however suspended until the Supreme Court of the State should render its decision in the cause.

The plaintiffs did not appeal from the order refusing to

grant an injunction against the tax collector. But the case
was carried to the Supreme Court of Georgia by the Board
of Education, where the judgment of the Superior Court
of Richmond County was reversed upon the ground that it
erred in granting an injunction against the Board of Edu-
cation. And in accordance with that decision the Superior
Court upon the return of the cause from the Supreme Court
of the State refused the relief asked by the plaintiffs and
dismissed their petition. The plaintiffs in error complain of
the latter order as being in derogation of their rights under
the Constitution of the United States.

*Mr. George F. Edmunds* for plaintiffs in error.

I. As construed by the Supreme Court of Georgia, the con-
stitution and laws of that State justified the Board of Edu-
cation in maintaining, at the expense of the plaintiffs, public
high schools for white children, and in abolishing and refus-
ing to keep up any similar or equivalent school for the educa-
tion of colored children. The record shows that the colored
high school was necessary for the education of the same class of
colored children as that of the white children, for which two
public high schools were provided. It shows that there was
a sufficient number of colored children receiving the benefits
of the colored high school when it was abolished, and that
their parents protested against its abolition. It shows that
the defendants themselves considered the colored high school
necessary by declaring, in connection with their abolition of
it, that they would reinstate it " whenever the Board, in their
judgment, could afford it."

II. It may be assumed that the decision of the Georgia
Supreme Court, that the constitution and laws of that State
warranted the action complained of (whether reviewable here
or not) was correct, although it would seem reasonably clear
that the opinion of the inferior court was the sound one,
unless the constitution and laws of Georgia were designed by
their framers to be illusory.

III. The question, then, is whether the Board of Education,

under its authority to " establish schools of higher grade at such points in the county as the interests and convenience of the people may require," authorized it to establish and maintain the advanced schools for the sole interest of the white children, and to refuse to maintain a similar school for the benefit of the colored children, while (though this makes no difference in principle) the parents of such colored children were being taxed and their money expended. to maintain such higher grade white schools ?    Although the first section of the eighth article of the constitution of Georgia only made it *compulsory* that common schools should be established for the elementary branches of an English education, and required the races to be taught separately, the fourth section authorized counties and cities to. tax for public schools, and to maintain them out of such taxation.    It is under this authority that the public schools in the county of Richmond are carried on.    This authorizes the counties and cities to go beyond elementary English education, and to provide, as most civilized States do, for that larger education which teaches not only reading, writing and arithmetic, but those things which lead to the enlargement of mental perceptions, respect for social order, and, indeed, everything that may tend to make the best state of society.    It is under this authority that the board of education has undertaken to discriminate distinctly and by name between the two races, and to impose upon one burdens of taxation from which they and their children receive no benefit, for the purpose of giving educational benefits necessary to public interests, to the white children alone.    The sole pretence for this discrimination is, as expressly stated by themselves, that they cannot .afford it.    That is, that all of the public funds applicable to education of the higher grade in the public schools shall be devoted to the benefit of the white children, and none of it applied for the similar education of colored children.    The excuse stated being that the Board does not wish to increase taxation which they have the power to impose (then only one fourth of one cent per $100), and that it can make good use of the money that would otherwise be expended in support of a colored high

school, for the elementary education of some colored children for which the common school houses at that time furnished no accommodation. It is not anywhere hinted by the defence that there were not adequate accommodations for all the white children, both in the common and high schools; from which it conclusively follows that the public funds have been devoted to the complete provision for all the white children, when they had not for the colored children. The Board of Education was, under the law as construed, the master of all this. Every provision, therefore, having been made for the full education of the white children, and inadequate provision having been made for the elementary education of the colored children, the Board abolishes the colored high school because it cannot afford to maintain it. This, it is earnestly submitted, is not the reasonable exercise of such discretion as the Board may have lawfully had, or the exercise of any discretion at all. It is the arbitrary denial of the equal protection of the laws to these persons of the colored race. It is believed that all the numerous decisions of this court upon this and analogous subjects are agreeable to the foregoing statement. It is unnecessary to refer to more than a very few of them.

In *Chicago, Burlington &c. Railroad* v. *Chicago*, 166 U. S. 226, it was held that the prohibitions of the Fourteenth Amendment referred to all the instrumentalities of the State, legislative, executive and judicial, and that if any public officer under a state Government deprives another of any right protected by that amendment he violates the Constitution. In *Gulf, Colorado &c. Railroad* v. *Ellis*, 165 U. S. 150, 154, it was declared that constitutional provisions of the character herein questioned should be liberally construed, and that the courts should be watchful to guard against any stealthy encroachments thereon, and that otherwise the protecting clauses of the Fourteenth Amendment would be a mere rope of sand, in no manner restraining state action. It declared that classifications and distinctions could not be made arbitrarily. In this case the discrimination was arbitrary, no matter how good the motive of the Board may possibly have been. If such action can be upheld, the Board will forever be

the sole judge of when it can "afford" to give the colored race the same advantage of public education that they tax them to give to the whites. If there is really any life or spirit in the Fourteenth Amendment, such conduct cannot be upheld. In *Yick Wo* v. *Hopkins*, 118 U. S. 356, this court said that, in spite of what the state court might have thought about it, it would put upon the ordinances of San Francisco an independent construction, and determine whether the proceedings under them were in conflict with the Constitution of the United States or not. In that case the ordinance vested in a board of supervisors the discretion of granting or withholding their assent to the use of wooden buildings as laundries, and so forth. The state court held that that was a discretion not judicially reviewable. This court denied the proposition, and held that while the ordinance gave absolute power to the board, the power was not confided to it as a discretion of regulation, but was to be exercised at their mere will, and that, so construed, it could not be maintained when exercised so as to produce inequality. This court held that the Fourteenth Amendment required " not only that there should be no arbitrary deprivation of life or liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights;" and that " no greater burdens should be laid upon one than are laid upon others in the same calling and condition." This court held that the principles upon which our Constitution rests do not "mean to leave room for the play and action of purely personal and arbitrary power." And it held that where the law gives a discretion, that discretion cannot be used, under color of regulating, to subvert or injuriously restrain a right, and that such questions are always open to judicial inquiry. To use the language of this court in that case, the Board has, in the exercise of its authority, applied and administered the law with " an unequal hand, so as practically to make unjust and unethical discriminations between persons in similar circumstances, material to their rights;" and that in such case " the denial of equal justice is still within the prohibitions of the

Constitution." The case of *Plessy* v. *Ferguson*, 163 U. S. 537, chiefly relied upon by the other side, is entirely consistent with and supports our contention. The case itself determined that a state law requiring separate railway carriages for the two races was valid, if provision were made for equal accommodations for both races, and the case stood upon the solid and indisputable ground that neither race was discriminated against in any particular, and it quoted with approval the opinion of the Court of Appeals of New York, that "when the Government, therefore, has secured to each of its citizens equal rights before the law, and equal opportunities for improvement and progress, it has accomplished the end for which it was organized," and so forth. In *Strauder* v. *West Virginia*, 100 U. S. 303, this court held that the Fourteenth Amendment " was designed to assure to the colored race the enjoyment of all the civil rights that under the law are enjoyed by white persons, and to give to that race the protection of the General Government in that enjoyment whenever it shall be denied by the States." The court further said that the words of the amendment, while prohibitory, "contained by necessary implication a positive immunity of right, most valuable to the colored race — the right to exemption from unfriendly legislation against them distinctively as colored — the exemption from legal discriminations implying inferiority in civil society, lessening the security of their rights which others enjoy," and so forth.

IV. It will thus be seen that the fact that the school Board had authority to establish and maintain public high schools at convenient places, and so forth, gives them no authority to establish and maintain public high schools for one race and to refuse to maintain them for the other, when the conditions and necessities for that advanced education existed in one race as well as the other in the place where their authority was to be exercised. These necessities and conditions are by the evidence of the board itself proved to exist.

The necessity for the public high schools for the colored children is, I repeat, distinctly confessed, and the only pretence of excuse for abolishing it, as stated by the Board itself, was

that it could employ the money necessary for its maintenance more advantageously by devoting it to common school purposes, while it could continue to employ all the money necessary to carry on the two white high schools in the same place. The mere statement of the case, in view of what this court has already decided, condemns such conduct, no matter how good the motive or how ethically wise the action of the Board may have been had it not been restrained by the fundamental provisions of the Constitution, although it is not by any means admitted that the motive of the Board was purely in the public interest further than to avoid raising taxes to carry on the colored schools as well as the white ones, and although it is denied that the action was ethically wise.

V. In respect of the contention stated in the brief on the other side that Bohler, the tax collector, should have been made a party to this writ of error, it is sufficient to say that the petition as to him was dismissed by the Superior Court at the hearing, and that no appeal was taken by the petitioners. And it appears that when the case was remitted from the Supreme Court of Georgia that only the Board of Education had judgment for its costs, Bohler having disappeared, as before stated. And it further appears that it was only the Board of Education that took exceptions and carried the cause to the Supreme Court of the State. The whole relief sought against Bohler was denied, and the petitioners acquiesced. Bohler therefore ceased to be any longer interested in the cause or a party thereto. His presence as a party was not in any respect essential or proper for that part of the controversy remaining. It may be said with all respect to the learned counsel on the other side that his point as to parties is an imaginary technicality, even if the record does not show a formal dismissal of Bohler. See *Gumbel* v. *Pitkin et als,* 113 U. S. 545.

*Mr. Joseph Ganahl* and *Mr. Frank H. Miller* for defendant in error.

MR. JUSTICE HARLAN, after stating the facts as above, delivered the opinion of the court.

This writ of error brings up for review a final order made in the Superior Court of Richmond County, Georgia, in conformity to a judgment rendered in the Supreme Court of the State. That order, it is contended, deprived the plaintiffs in error of rights secured to them by the Fourteenth Amendment to the Constitution of the United States.

The Supreme Court of Georgia after stating in its opinion that counsel for the petitioners did not point out in his brief what particular paragraph of the Fourteenth Amendment was violated, said: " If it be the first, he does not point out. what clause of that paragraph is violated, whether the privileges or immunities of citizens of the United States are abridged, whether his clients are deprived of life, liberty or property without due process of law, or whether his clients are denied the equal protection of the laws. It is difficult, therefore, for us to determine whether this amendment has been violated. If any authority had been cited, we could from that have determined which paragraph or clause counsel relied upon, but as he has left us in the dark we can only say that in our opinion none of the clauses of any of the paragraphs of the amendment, under the facts disclosed by the record, are violated by the Board. There is no complaint in the petition that there is any discrimination made in regard to the free common schools of the county. So far as the record discloses, both races have the same facilities and privileges of attending them. The only complaint is that these plaintiffs, being taxpayers, are debarred the privilege of sending their children to a high school which is not a free school, but one where tuition is charged, and that a portion of the school fund, raised by taxation, is appropriated to sustain white high schools to which negroes are not admitted. We think we have shown that it was in the discretion of the Board to establish high schools. It being in their discretion, they could, without a violation of the law or of any constitution, devote a portion of the taxes collected for school purposes to the support of this high school for white girls and to assist a county denominational high school for boys. In our opinion; it is impracticable to distribute taxes equally. The appropri-

ation of a portion of the taxes for a white girls' high school is not more discrimination against these colored plaintiffs than it is against many white people in the county. A taxpayer who has boys and no girls of a school age has as much right to complain of the unequal distribution of the taxes to a girls' high school as have these plaintiffs. The action of the Board appears to ús to be more a discrimination as to sex .than it does as to race. While the Board appropriates some money to assist a denominational school for white boys and girls, it has never established a high school for white boys, and, if the contention of these plaintiffs is correct, white parents who have boys old enough to attend a high school have as much right to complain as these plaintiffs, if they have not more. Without, therefore, going into an analysis of the different clauses of the Fourteenth Amendment of the Constitution of the United States, we content ourselves by saying that, in our opinion, the action of the Board did not violate any of the provisions of that amendment. It does not abridge the privileges or immunities of citizens of the United States, nor does it deprive any person of life, liberty or property without due process of law, nor does it deny to any person within the State the equal protection of its laws."

The constitution of Georgia provides: " There shall be a thorough system of common schools for the education of children in the elementary branches of an English education only, as nearly uniform as practicable, the expenses of which shall be provided for by taxation or otherwise. The schools shall be free to all children of the State, but separate schools shall be provided for the white and colored races. " Art. 8, § 1.

It was said at the argument that the vice in the common school system of Georgia was the requirement that the white and colored children of the State be educated in separate schools. But we need not consider that question in this case. No such issue was made in the pleadings. Indeed, the plaintiffs distinctly state that they have no objection to the tax in question so far as levied for the support of primary, intermediate and grammar schools, in the management of which

the rule as to the separation of races is enforced. We must dispose of the case as it is presented by the record.

The plaintiffs in error complain that the Board of Education used the funds in its hands to assist in maintaining a high school for white children· without providing a similar school for colored children. The substantial relief asked is an injunction that would either impair the efficiency of the high school provided for white children or compel the Board to close it. But if that were done, the result would only be to take from white children educational privileges enjoyed by them, without giving to colored children additional opportunities for the education furnished in high schools. The colored school children of the county would not be advanced in the matter of their education by a decree compelling the defendant Board to cease giving support to a high school for white children. The Board had before it the question whether it should maintain, under its control, a high school for about sixty colored children or withhold the benefits of education in primary schools from three hundred children of the same race. It was impossible, the Board believed, to give educational facilities to the three hundred colored children who were unprovided for, if it maintained a separate school for the sixty children who wished to have a high school education. Its decision was in the interest of the greater number of colored children, leaving the smaller number to obtain a high school education in existing private institutions at an expense not beyond that incurred in the high school discontinued by the Board.

We are not permitted by the evidence in the record to regard that decision as having been made with any desire or purpose on the part of the Board to discriminate against any of the colored school children of the county on account of their race. But if it be assumed that the Board erred in supposing that its duty was to provide educational facilities for the three hundred colored children who were without an opportunity in primary schools to learn the alphabet and to read and write, rather than to maintain a school for the benefit of the sixty colored children who wished to attend a high

school, that was not an error which a court of equity should attempt to remedy by an injunction that would compel the Board to withhold all assistance from the high school maintained for white children. If, in some appropriate proceeding instituted directly for that purpose, the plaintiffs had sought to compel the Board of Education, out of the funds in its hands or under its control, to establish and maintain a high school for colored children, and if it appeared that the Board's refusal to maintain such a school was in fact an abuse of its discretion and in hostility to the colored population because of their race, different questions might have arisen in the state court.

The state court did not deem the action of the Board of Education in suspending temporarily and for economic reasons the high school for colored children a sufficient reason why the defendant should be restrained by injunction from maintaining an existing high school for white children. It rejected the suggestion that the Board proceeded in bad faith or had abused the discretion with which it was invested by the statute under which it proceeded or had acted in hostility to the colored race. Under the circumstances disclosed, we cannot say that this action of the state court was, within the meaning of the Fourteenth Amendment, a denial by the State to the plaintiffs and to those associated with them of the equal protection of the laws or of any privileges belonging to them as citizens of the United States. We may add that while all admit that the benefits and burdens of public taxation must be shared by citizens without discrimination against any class on account of their race, the education of the people in schools maintained by state taxation is a matter belonging to the respective States, and any interference on the part of Federal authority with the management of such schools cannot be justified except in the case of a clear and unmistakable disregard of rights secured by the supreme law of the land. We have here no such case to be determined; and as this view disposes of the only question which this court has jurisdiction to review and decide, the judgment is

*Affirmed.*