**WESTMINSTER SCHOOL DIST. OF ORANGE COUNTY et al. v. MENDEZ et al.**

No. 11310.

Circuit Court of Appeals, Ninth Circuit.

April 14, 1947.

As Corrected Aug. 1, 1947.

 

Joel E. Ogle, County Counsel, George F. Holden and Royal E. Hubbard, Deputies County Counsel, all of Santa Ana, Cal., for appellant.

David C. Marcus, Los Angeles, Cal. (William Strong, of Los Angeles, Cal., of counsel), for appellees.

Thurgood Marshall, and Robert L. Carter,, both of New York City, and Loren Miller, of Los Angeles, Cal., for Nat. Ass'n Advancement of Colored People, amicus curiæ.

Will Maslow and Pauli Murray, both of New York City, Anne H. Pollock, of Los Angeles, Cal. (Alexander H. Pekelis, of New York City, Spe. Advisor), for American Jewish Congress, amicus curiæ.

Julien Cornell, Arthur Garfield Hays and Osmond K. Fraenkel, all of New York City, A. L. Wirin and Fred Okrand, both of Los Angeles, Cal., for American Civil Liberties Union, amicus curiæ.

Charles F. Christopher, of Los Angeles, Cal., for Nat. Lawyers Guild, Los Angeles Chapter, amicus curiæ.

A. L. Wirin and Saburo Kido, both of Los Angeles, Cal., for Japanese-American Citizens League.

Robert W. Kenney, Atty. Gen., of Cal., and T. A. Westphal, Jr., Deputy Atty. Gen., for Atty. Gen. of Cal., amicus curiæ.

Before GARRECHT, DENMAN, MATHEWS, STEPHENS, HEALY, BONE, and ORR, Circuit Judges.

STEPHENS, Circuit Judge.

The petition herein which prays for present and future relief and costs is filed under authority of section 24, subdivision 14, of the Judicial Code, 28 U.S.C.A. § 41 (14),[1] and section 43 of 8 U.S.C.A.,[2] and is based upon alleged violations of petitioners' civil rights as guaranteed by the 5th and 14th amendments to the Constitution of the United States. No argument as to the application of the 5th amendment is made in this appeal and it need not be considered.

The petition contains allegations to the following effect. A number of minors (at least one each from each school division herein mentioned) for themselves and for some 5000 others as to whom the allegations of the complaint apply,[3] citizens of the United States of Mexican descent, who attend the public schools of the State of California in Orange County, filed a petition by their fathers, as next friends, for relief against trustees and superintendents of several school districts and against the superintendent and secretary and members of a city board of education. Unless we shall indicate otherwise, our use of the terms "school districts", "districts" or "schools" will be understood as inclusive of both district and city school territories

---

[1] Section 41. (Judicial Code, section 24, amended.) Original jurisdiction. The district courts shall have original jurisdiction as follows: * * * (14) Suits to redress deprivation of civil rights. Fourteenth. Of all suits at law or in equity authorized by law to be brought by any person to redress the deprivation, under color of any law, statute, ordinance, regulation, custom, or usage, of any State, of any right, privilege, or immunity, secured by the Constitution of the United States, or of any right secured by any law of the United States providing for equal rights of citizens of the United States, or of all persons within the jurisdiction of the United States."

[2] "§ 43. Civil action for deprivation of rights

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[3] Rule 23 of Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c as to class suits.

or schools. The term "school officials" includes all respondents.

All petitioners are taxpayers of good moral habits, not suffering from disability, infectious disease, and are qualified to be admitted to the use of the schools and facilities within their respective districts and systems.

A common plan of the school officials has been adopted and practiced, and common rules and regulations have been adopted and put into effect, whereby (using the words of the petition) "petitioners and all others of Mexican and Latin descent" are "barred, precluded and denied", "attending and using and receiving the benefits and education furnished to other children", and are segregated in schools "attended solely by children of Mexican and Latin descent". To such treatment, petitioners and others in the same situation have objected, and they have demanded and have been refused admission to schools within their respective districts which they would attend but for the practice of segregation. "That by this suit and proceedings, petitioners seek to redress the deprivation by respondents herein [school officials] under color of regulation, custom and usage of petitioners' civil rights, privileges and/or immunities secured to them by the Laws of the United States, and guaranteed to each of them by the Laws and Constitution of the United States of America."

To the petition, the school officials respond by a motion to dismiss for lack of federal court jurisdiction, because (to use the words of the motion) "this is not a suit at law or in equity authorized by law to be brought by any person to redress the deprivation, under color of any law, statutes, ordinances, regulation, custom, or usage, of any state, of any right, privilege, or immunity, secured by any law of the United States providing for equal rights of citizens of the United States or of all

persons within the jurisdiction of the United States," and because the "petition fails to state a claim upon which relief can be granted." The motion was denied without prejudice to the assertion of any available legal defenses by way of answers to the petition. Respondents in their answer reassert their position as to the law in the motion to dismiss, and put in issue all of the allegations relating to the subject of segregation.[4]

After submission of the case for decision, the court filed its written opinion under the title "Conclusions of the Court".[4a] Thereafter, Findings of Fact and Conclusions of Law were filed, generally supporting petitioners' complaint. Respondents objected to the Findings of Fact on the ground that the evidence showed without conflict school children of Mexican descent had been and are being furnished with facilities fully equal to other school children, and that no finding had been made thereon. The court overruled the objection, and declined to make the requested finding upon the ground that it is immaterial to the issue of the case.

Thereafter, a judgment was entered to the effect that all segregation found to have been practiced was and is arbitrary and discriminating and in violation of rights guaranteed to plaintiffs by the Constitution of the United States. All respondents were enjoined against continuance of the segregation, and costs were entered against the several school districts.

Respondents appeal from the judgment upon eight points which may be stated simply as contentions that the District Court was and is without jurisdiction over the subject matter because no substantial federal question is put in issue, and that suit is not authorized by law to redress the alleged deprivation of constitutional rights and that the findings do not support the conclusions.

---

[4] It is alleged in the answer that a large number of school children concerned are unfamiliar with and unable to speak the English language. Other affirmative defenses are alleged but they need not be mentioned for the reason that the findings of fact are not attacked and the appeal is based upon the question as to whether or not petitioners' civil rights

under the Fourteenth Amendment to the Constitution of the United States have been violated.

[4a] The author of this opinion deems it appropriate to note that the case was tried to the distinguished Senior Judge of the Southern District of California, Honorable Paul J. McCormick.

Summed up in a few words it is the burden of the petition that the State of California has denied, and is denying, the school children of Mexican descent, residing in the school districts described, the equal protection of the laws of the State of California and thereby have deprived, and are depriving, them of their liberty and property without due process of law, as guaranteed by the Fourteenth Amendment of the Constitution of the United States.[5]

Respondents are officers of the State of California in the Department of Education of that state, and as it will hereinafter be

[5] As to the protection and deprivation of liberty and property without due process of law clauses of the Fourteenth Amendment, see Plessy v. Ferguson, 163 U.S. 537, 547, 16 S.Ct. 1138, 41 L.Ed. 256; Bell's Gap. R. R. v. Pennsylvania, 134 U.S. 232, 10 S.Ct. 533, 33 L.Ed. 892; Missouri v. Lewis, 101 U.S. 22, 31, 25 L.Ed. 989. We quote from American Sugar Refining Co. v. Louisiana, 179 U.S. 89, 92, 21 S.Ct. 43, 44, 45 L.Ed. 102: "The act in question does undoubtedly discriminate in favor of a certain class of refiners, but this discrimination, if founded upon a reasonable distinction in principle, is valid. Of course, if such discrimination were purely arbitrary, oppressive, or capricious, and made to depend upon differences of color, race, nativity, religious opinions, political affiliations, or other considerations having no possible connection with the duties of citizens as taxpayers, such exemption would be pure favoritism, and a denial of the equal protection of the laws to the less favored classes." And in Truax v. Raich, 239 U.S. 33, 41, 36 S.Ct. 7, 10, 60 L.Ed. 131, L.R.A.1916D, 545, Ann. Cas.1917B, 283, Mr. Justice Hughes, as an associate justice, speaking for the court said: "It is sought to justify this act [an act limiting employment of aliens] as an exercise of the power of the state to make reasonable classifications in legislating to promote the health, safety, morals, and welfare of those within its jurisdiction. But this admitted authority, with the broad range of legislative discretion that it implies, does not go so far as to make it possible for the state to deny to lawful inhabitants, because of their race or nationality, the ordinary means of earning a livelihood. It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the Amendment to secure. [Cases cited.] If this could be refused solely upon the ground of race or nationality, the prohibition of the denial to any person of the equal protection of the laws would be a barren form of words." Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042, 29 A.L.R. 1446: "'No state * * * shall deprive any person of life, liberty, or property, without due process of law.' [Fourteenth Amendment.] While this Court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." Following this portion of the Meyer case are cases cited: In re Slaughter-House Cases, 16 Wall. 36, 21 L.Ed. 394; Butchers' Union Slaughter-House Co. v. Crescent City Live-Stock Landing Co., 111 U.S. 746, 4 S.Ct. 652, 28 L.Ed. 585; Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220; Minnesota v. Barber, 136 U.S. 313, 10 S.Ct. 862, 34 L. Ed. 455; Allgeyer v. Louisiana, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832; Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937, 3 Ann.Cas. 1133; Twining v. New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97; Chicago, Burlington & Quincy R. R. Co. v. McGuire, 219 U.S. 549, 31 S.Ct. 259, 55 L.Ed. 328; Truax v. Raich, 239 U.S. 33, 38 S.Ct. 337, 62 L.Ed. 772, Ann.Cas.1918E, 593; Adams v. Tanner, 244 U.S. 590, 37 S.Ct. 662, 61 L.Ed. 1336, L.R.A.1917F, 1163, Ann.Cas.1917D, 973; New York Life Ins. Co. v. Dodge, 246 U.S. 357, 38 S.Ct. 337, 62 L.Ed. 772, Ann.Cas.1918E, 593; Truax v. Corrigan, 257 U.S. 312, 42 S.Ct. 124, 66 L.Ed. 254, 27 A.L.R. 375; Adkins v. Children's Hospital, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785, 24 A.L.R. 1238; Wyeth v. Cambridge Board of Health, 200 Mass. 474, 86 N.E. 925, 23 L.R.A.,N.S., 147, 128 Am.St.Rep. 439. See also, Farrington v. Tokushige, 273 U.S. 284, 47 S.Ct. 406, 71 L.Ed. 646; and Pierce v. Society of Sisters, 268 U. S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468. See exhaustive discussion in Wysinger v. Crookshank, 82 Cal. 588, 23 P. 54.

shown their action under the intendment of the Fourteenth Amendment is the action of the state in all cases where such action is taken under color of state law. We must, therefore, consider the questions: Are the alleged acts done under color of state law, and do they deprive petitioners of any constitutional right? The jurisdictional question is implicit in these two questions.

■ It is said in Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 776, that " * * * the court must assume jurisdiction to decide whether the allegations state a cause of action on which the court can grant relief as well as to determine issues of fact arising in the controversy." Therefore, the District Court was right in taking jurisdiction.

■ Were the acts complained of performed under color of state law, or since there is no dispute that the law of California does not authorize the segregation practiced, are the acts merely personal to the actors and in no sense state acts? That the acts complained of have been and are being performed under color of state law has been conclusively and affirmatively answered in principle in Home Telephone & Telegraph Co. v. Los Angeles, 227 U.S. 278, 33 S.Ct. 312, 57 L.Ed. 510, wherein it was claimed that the officer complained of was a state agent and the state could not be held responsible for acts of the agency not within the terms of the agency. We quote from page 287 of 227 U.S., at page 315 of 33 S.Ct., 57 L.Ed. 510 of the opinion: "In other words, the proposition is that the Amendment [Fourteenth Amendment of the Constitution] deals only with the acts of state officers within the strict scope of the public powers possessed by them, and does not include an abuse of power by an officer as the result of a wrong done in excess of the power delegated. Here again the settled construction of the Amendment is that it presupposes the possibility of an abuse by a state officer or representative of the powers possessed, and deals with such a contingency. It provides, therefore, for a case where one who is in possession of state power uses that power to the doing of the wrongs which the Amendment forbids, even although the consummation of the wrong may not be within the powers possessed, if the commission of the wrong itself is rendered possible or is efficiently aided by the state authority lodged in the wrongdoer. That is to say, the theory of the Amendment is that where an officer or other representative of a state, in the exercise of the authority with which he is clothed, misuses the power possessed to do a wrong forbidden by the Amendment, inquiry concerning whether the state has authorized the wrong is irrelevant [as to the point under discussion], and the Federal judicial power is competent to afford redress for the wrong by dealing with the officer and the result of his exertion of power." See Barney v. City of New York, 193 U.S. 430, 24 S.Ct. 502, 48 L.Ed. 737; Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497; Cochran v. Kansas, 316 U.S. 255, 62 S.Ct. 1068, 86 L.Ed. 1453.

The latest case upon the subject to which our attention has been called is Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, 162 A.L.R. 1330. That case is a criminal one, and treats of a criminal statute implementing the Fourteenth Amendment as 8 U.S.C.A. § 43 implements the Amendment in our case. The principles to be applied are the same. At page 111 of 325 U.S., at page 1040 of 65 S.Ct., 89 L.Ed. 1495, 162 A.L.R. 1330 of the opinion it is said: "We are not dealing here with a case where an officer not authorized to act nevertheless takes action. Here the state ficers were authorized to make an arrest and to take such steps as were necessary to make the arrest effective. They acted without authority only in the sense that they used excessive force in making the arrest effective. It is clear that under 'color' of law means under 'pretense' of law. Thus acts of officers in the ambit of their personal pursuits are plainly excluded. Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it. If, as suggested, the statute was designed to embrace only action which the State in fact authorized, the words 'under color of any law' were hardly apt words to express the idea." See United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368, wherein the court said: "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer

is clothed with the authority of state law, is action t...xen 'under color of' state law."

It is clear of doubt that the acts complained of in the instant case pertain to the subject of the respondents' power and duties. Respondents, in immediate charge of the schools, have limited authority to receive or reject persons presenting themselves as pupils, and while acting to receive or reject, they are acting within the .general scope of such authority whether the acts are right or wrong. The denial of school privileges to persons in certain schools upon the sole ground of their Mexican ancestry by respondents is not "in the ambit of their personal pursuits", but are acts undertaken in the performance of their official duties. However, the respondents "did not hew to the line of their authority"; they overstepped it. To the same intent are the following quotations from Home Tel. & Tel., supra, " * * * the provisions of the Fourteenth Amendment * * * generic in their terms are addressed, of course, to the states, but also to every person * * who is the repository of state power." At page 286 of 227 U.S., at page 314 of 33 S.Ct., 57 L.Ed. 510. "The subject must be tested by assuming that the officer possessed the power if the act be one which there would not be opportunity to perform but for possession of some state authority." At page 289 of 227 U.S., at page 315 of 33 S.Ct., 57 L.Ed. 510.

We hold that the respondents acting to segregate the school children as alleged in the petition were performing under color of California State law.

The court found that the segregation as alleged in the petition has been for several years past and is practiced under regulations, customs and usages adopted more or less as a common plan and enforced by respondent-appellants throughout the men-

tioned school districts; that petitioners are citizens of the United States of Mexican ancestry of good moral habits, free from infectious disease or any other disability, and are fully qualified to attend and use the public school facilities; that respondents occupy official positions as alleged in the petition.

In both written and oral argument our attention has been directed to the cases in which the highest court of the land has upheld state laws providing for limited segregation of the great races of mankind. In Roberts v. City of Boston, 5 Cush. Mass., 198,[6] a law providing for the segregation of colored school children was held valid in an opinion by Chief Justice Shaw of the Supreme Judicial Court of Massachusetts, but that equal facilities must be provided for the use of the colored children. Chief Justice Wallace of the Supreme Court of California in Ward v. Flood, 48 Cal. 36, 17 Am.Rep. 405, followed with approval. Cumming v. Board of Education, 175 U.S. 528, 20 S.Ct. 197, 44 L.Ed. 262, reaffirmed the principle. In Gong Lum v. Rice, 275 U.S. 78, 48 S.Ct. 91, 72 L.Ed. 172, the principle of the Roberts case, supra, was followed in the opinion written by Chief Justice Taft and affirmed the State Supreme Court of Mississippi in its application of the "colored" school segregation statute to an American citizen of pure Chinese blood. Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, was upon the right of the state to require segregation of colored and white persons in public conveyances, and the act so providing was sustained again upon the principles expressed by Chief Justice Shaw. This list of cases is by no means complete.

It is argued by appellants that we should reverse the judgment in this case upon the authority of the segregation cases just cited

---

6 The decision in the case of Roberts v. City of Boston, 5 Cush. 198, cited in the majority opinion in the above entitled case (April 14, 1947), was not founded directly upon a state statute. A state statute granted certain discretionary powers to an elected School Committee, but these powers did not specifically provide for any segregation of school children on the basis of race or color. However, Boston had long conducted separate schools for colored school children. Shortly before institution of the case (the case antedated the Civil War), which was for damages allegedly suffered by the plaintiff, a colored child, for being excluded from the school nearest her residence, the School Committee had adopted a resolution approving the policy of continuing the separate schools. The decision in the case upheld the acts of the Committee. (Stephens, C. J.)

because the Supreme Court has upheld the *right of the states to provide for segregation* upon the requirement that equal facilities be furnished each segregated group. Appellees argue that the segregation cases do not rule the instant case. There is argument in two of the amicus curiae briefs that we should strike out independently on the whole question of segregation, on the ground that recent world stirring events have set men to the reexamination of concepts considered fixed. Of course, judges as well as all others must keep abreast of the times but judges must ever be on their guard lest they rationalize outright legislation under the too free use of the power to interpret. We are not tempted by the siren who calls to us that the sometimes slow and tedious ways of democratic legislation is no longer respected in a progressive society. For reasons presently to be stated, we are of the opinion that the segregation cases do not rule the instant case and that is reason enough for not responding to the argument that we should consider them in the light of the amicus curiae briefs. In the first place we are aware of no authority justifying any segregation fiat by an administrative or executive decree as every case cited to us is based upon a legislative act. The segregation in this case is without legislative support and comes into fatal collision with the legislation of the state.

 The State of California has a state-wide free school system governed by general law, the local application of which by necessity is to a considerable extent, under the direction of district and city school boards or trustees, superintendents and teachers. Section 16601 of the California Educational Code requires the parent of any child between the ages of eight and sixteen years to send him to the full time day school. There are some few exceptions, but none of them are pertinent here. There are

no exceptions based upon the ancestry of the child other than those contained in §§ 8003, 8004, Calif.Ed.C. (Both repealed as of 90 days after June 14, 1947.), which includes Indians under certain conditions and children of Chinese, Japanese or Mongolian parentage. As to these, there are laws requiring them in certain cases to attend separate schools. Expressio Unius Est Exclusio Alterius. It may appropriately be noted that the segregation so provided for and the segregation referred to in the cited cases includes only children of parents belonging to one or another of the great races of mankind.[7] It is interesting to note at this juncture of the case that the parties stipulated that there is no question as to race segregation in the case. Amicus curiae brief writers, however, do not agree that this is so. Nowhere in any California law is there a suggestion that any segregation can be made of children within one of the great races. Thus it is seen that there is a substantial difference in our case from those which have been decided by the Supreme Court, a difference which possibly could be held as placing our case outside the scope of such decisions. However, we are not put to this choice as the state law permits of segregation only as we have stated, that is, it is definitely confined to Indians and certain named Asiatics. That the California law does not include the segregation of school children because of their Mexican blood, is definitely and affirmatively indicated as the trial judge pointed out, by the fact that legislative action has been taken by the State of California to admit to her schools, children citizens of a foreign country, living across the border. Calif.Ed.C. §§ 16004, 16005. Mexico is the only foreign country on any California boundary.[8]

It follows that the acts of respondents were and are entirely without authority of California law, notwithstanding their

---

[7] Somewhat empirically, it used to be taught that mankind was made up of white, brown, yellow, black and red men. Such divisional designation has little or no adherents among anthropologists or ethnic scientists. A more scholarly nomenclature is Caucasoid, Mongoloid and Negroid, yet this is unsatisfactory, as an attempt to collectively sort all mankind into distinct groups.

[8] The right of children to attend schools organized under laws of the state has been termed a fundamental right. See Wysinger v. Crookshank, 82 Cal. 588, 23 P. 54. Education "is a privilege granted by the state constitution, and is a legal right as much as is a vested right in property." 23 Cal.Jur. pp. 141, 142. In the same volume, p. 161: "It is now settled that it is not in violation of the

performance has been and is under color or pretense of California law. Therefore, conceding for the argument that California could legally enact a law authorizing the segregation as practiced, the fact stands out unchallengeable that California has not done so but to the contrary has enacted laws wholly inconsistent with such practice. By enforcing the segregation of school children of Mexican descent against their will and contrary to the laws of California, respondents have violated the federal law as provided in the Fourteenth Amendment to the Federal Constitution by depriving them of liberty and property without due process of law and by denying to them the equal protection of the laws.

■ It may be said at this point that the practice could be stopped through the application of California law in California State Courts, and this may be so but the idea is of no relevancy. Mr. Justice Douglas made this point clear in the case of Screws v. United States, supra, when he said that the Fourteenth Amendment does not come into play merely because the federal law or the state law under which the officer purports to act is violated. *"It is applicable when and only when some one is deprived of a federal right by that action."* (Emphasis ours.) And it is as appropriate for us to say here, what Mr. Justice Douglas said in a like situation in the cited case, "We agree that when this statute is applied [in our case when § 41(14) of 28 U.S.C.A. is applied] it should be construed so as to respect the proper balance between the states and the federal government in law enforcement." Punishment for the act would be legal under either or both federal and state governments. United States v. Lanza, 260 U.S. 377, 382, 43 S.Ct. 141, 67 L.Ed. 314; Hebert v. Louisiana, 272

U.S. 312, 47 S.Ct. 103, 71 L.Ed. 270, 48 A.L. R. 1102. However, since the practice complained of has continued for several consecutive years, apparent to California executive and peace officers, and continues, it cannot be said that petitioners violated Mr. Justice Douglas' admonition in taking their action in a federal court.

In the view of the case we have herein taken the contention that the Findings of Fact do not support the Conclusions of Law and the Judgment is wholly unmeritorious. The pleadings, findings and judgment in this case refer to children of "Mexican and Latin descent and extraction", but it does not appear that any segregation of school children other than those of Mexican descent was practiced. Therefore, we have confined our comment thereto. If the segregation of all children of Latin descent and extraction in addition to those of Mexican descent were included in the practice and the plan, its illegality would, of course, be upon the same basis as that herein found. In addition, however, the impossibility of there being any reason for the inclusion in the segregation plan of all children of Latin descent and extraction and the palpable impossibility of its enforcement would brand any such plan void on its face.[9]

Affirmed.

DENMAN, Circuit Judge (concurring).

I concur in what is said in the court's opinion but cannot agree with the omission of the consideration of Lopez v. Seccombe, so widely discussed in the profession. I am also of the opinion that we should not place a primary reliance upon Home Telephone & Telegraph Co. v. Los Angeles, which in particulars relevant here is overruled by the Snowden and Screws cases. The precedent of the recent decision in

organic law of the state or of the nation to require children in whom racial differences exist to attend separate schools, provided the schools are equal in every substantial respect. But only in the event such schools are established may children be separated in respect of race. And no separation may be had, in the absence of statutory or constitutional authority therefor."

[9] The case of Lopez v. Seccombe, D.C.

S.D.Cal., 71 F.Supp. 769, cited and commented upon in the concurring opinion, went to uncontested judgment upon stipulation, and is supported alone by formal findings of facts and conclusions of law. No discussion of principles appears in the record, no opinion or memorandum was filed, and no counsel in the instant case mentioned it in his brief, notwithstanding the same lawyer was chief counsel in both cases. (Stephens, C. J.)

Snowden v. Hughes, infra, states the law as it now is, with requirements for violation of the Fourteenth Amendment not mentioned in the court's opinion.

(1) Lopez v. Seccombe, Mayor **of the** City of San Bernardino, California, D.C., S.D.Cal., 71 F.Supp. 769.

What our decision here does is to follow the precedent of Judge Yankwich's decision in the Lopez case. It is not only in Orange County that public officers are guilty of such perversions of the "privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." [1] In an adjoining county a similar discrimination was made not only against the descendants of Mexican nationals but of *descendants, adult and infant, of all nationals of Latin countries.*

San Bernardino established a public park and recreational ground with an area containing a swimming pool and bath house. The mayor, city councilmen, chief of police and park superintendent, all through their agents, barred from their entry into the area all persons of *Latin* descent. The exclusion was not merely of Mexicans but of all Latins, that is of people from the score or more Latin American Republics and from Italy, Spain and Portugal, as the outstanding character of persons actually excluded makes clear.

The Reverend R. N. Nunez is a Catholic priest of Mexican ancestry. Eugenio Nogueros is from Porto Rico, of Latin ancestry, a college graduate, who is an editor and publisher. Ignacio Lopez another newspaper editor is of Mexican descent a graduate of the University of California,

recently the head of the Spanish Department in the Office of Foreign Language, Division of Office of War Information, and the Spanish speaking director of the Office of Coordinator of inter-American affairs at Los Angeles, California. All are citizens of the United States. The two editors were taxpayers contributing to the support of the facilities denied them.

All three sought admission to the park area and its facilities and were excluded therefrom because of their Latin descent. This was not a mere casual error of a minor official at the park. The priest and the two editors and each of them on several occasions protested *to these city officials* and requested their permission to enter these public facilities but, because of their Latin descent, such permission was denied them.

In the case of Lopez et al. v. Seccombe et al., supra, the priest and the two editors, suing for themselves as American citizens and *eight thousand* (8,000) other San Bernardino persons of Latin descent, sought an injunction against the mayor, councilmen, chief of police and park superintendent for such discriminatory exclusion. The case was tried by Judge Yankwich who ruled, as in the instant case, that such discriminatory barring of the class of Latin descended people violated the due process and equal protection clause of the Fourteenth Amendment. The facts of the discrimination as to all persons of Latin descent were found, as above stated, and an injunction issued against the eight office holders.

In the San Bernardino case the answer of the officers denied the exclusion of the

---

[1] "While this Court has not attempted to define with exactness the liberty thus guaranteed [by due process clause of the Fourteenth Amendment], the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual [1] to contract, [2] to engage in any of the common occupations of life, [3], to acquire useful knowledge, [4] to marry, [5] to establish a home and bring up children, [6] to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.—[Citing cases.]" Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042, 29 A.L.R. 1446, holding a law prohibiting the teaching of foreign languages in school violates the Fourteenth Amendment.

[2] "I do solemnly swear (or affirm, as the case may be,) that I will support the Constitution of the United States and the Constitution of the State of California, and that I will faithfully discharge the duties of the office of * * * according to the best of my ability." Constitution of California, Article XX, Section 3.

plaintiffs. In the instant case these Orange County trustees, public officers sworn to uphold the Constitution of the United States and the constitution of the State of California,[2] brazenly proclaim their guilt in their discriminatory violation of the state educational laws. What is overlooked in the court's opinion is the fact that the appellants themselves declare they have violated their oaths of office and, in effect, say, "Well what are you going to do about it?" for their brief states

"The situation in California as conclusively shown by the record is:

"1. The legislative department of the State has clearly and expressly prohibited the establishment of separate schools for Mexican pupils.

"2. The Judicial Department of the State has emphatically declared it to be unlawful to establish separate schools for Mexican pupils (Wysinger v. Crookshank, 82 Cal. 588, 23 P. 54)."

California is a state as large as France and having a population at least a fifth as large as that of the United States when the Fourteenth Amendment was adopted. All the nations of the world have contributed to its people. Were the vicious principle sought to be established in Orange and San Bernardino Counties followed elsewhere, in scores of school districts the adolescent minds of American children would become infected. To the wine producing valleys and hills of northern counties emigrated thousands of Italians whose now third generation descendants well could have their law-breaking school officials segregate the descendants of the north European nationals.

Likewise in the raisin districts of the San Joaquin Valley to which came the thousands of Armenians who have contributed to national prominence such figures as Saroyan and Haig Patigan. So in the coastal town homes of fishermen, largely from the Mediterranean nations, the historic antipathies of Italian, Greek and Dalmatian nationals could be injected and perpetuated in their citizen school children.

Or, to go to the descendants of an ancient Mesopotamian nation, whose facial characteristics still survived in the inspiring beauty of Brandeis and Cardozo—the descendants of the nationals of Palestine, among whose people later began our so-called Christian civilization, as well could be segregated and Hitler's anti-semitism have a long start in the country which gave its youth to aid in its destruction.

It is to such school officials, who so violate their oaths of office and openly break both the state and federal laws and who set such an example to the boys and girls, that these adolescents are entrusted to grow up in the American way of life. In this connection it should be noted that Section 19 of the Criminal Code, 18 U.S.C.A. § 51, under which Screws was prosecuted, makes a felony of the same wrongdoing for which the succeeding Section 20, 18 U.S.C.A. § 52, creates the civil remedy here given by this court. As Justice Rutledge's opinion at page 119 of 325 U.S., at page 1044 of 65 S.Ct., 89 L.Ed. 1495, 162 A.L.R. 1330, of the Screws case states, they are "twin sections," in which there are "no differences in the basic rights guarded."

It is in accord with the long established precedent of Anglo Saxon judges to call to the attention of the prosecuting authorities facts appearing in litigation before them which may warrant the consideration of an indictment. Following that custom, the attention of the senior judge of the Southern District of California and the foremen of its grand juries is directed to the facts here disclosed.

(2) As the law is today it is not enough that a state official violates the state or federal law in the manner described in Home Telephone & Telegraph Co. v. Los Angeles, 227 U.S. 278, 282, 33 S.Ct. 312, 57 L.Ed. 510, to bring him within the due process and equal protection clause of the Fourteenth Amendment. On the facts shown in the opinion of the Supreme Court the City of Los Angeles today would not be held to have violated that Amendment.

In Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 401, 88 L.Ed. 497, the Supreme Court determined the boundary line of cases of officials' violations of state law within and without the Fourteenth Amendment. It is not enough that the federal or state law is violated. In addition either the law must be not "fair on its face" or

784

there must be an "intentional or purposeful * * * discriminatory design to favor one individual or class over another" in administering the law.

There, where an Illinois election board, in claimed violation of Illinois law, had failed to certify a citizen as a duly elected nominee for a state office, it was held that he was not denied the equal protection of the Fourteenth Amendment. This was not because he had a remedy under the state law but because that law was not discriminatory on its face and there was no showing of the board's intentional or purposeful discrimination of a "particular class." In holding the Amendment not violated, the Court, at page 8 of 321 U.S., at page 401 of 64 S.Ct., 88 L.Ed. 497, states the distinction between a mere incidental violation of a non-discriminatory state law and a purposeful "class" discrimination, as follows: '

"The unlawful administration by state officers of a *state statute fair on its face,* resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection *unless there is shown to be present in it an element of intentional or purposeful discrimination.* This may appear *on the face of the action taken with respect to a particular class or person,* cf. McFarland v. American Sugar Refining Co., 241 U.S. 79, 86, 87, 36 S.Ct. 498, 501, 60 L.Ed. 899, or it may only be shown by extrinsic evidence showing a discriminatory design to favor one individual or class over another not to be inferred from the action itself, Yick Wo v. Hopkins, 118 U.S. 356, 373, 374, 6 S.Ct. 1064, 1072, 1073, 30 L.Ed. 220. * * *" (Emphasis supplied.)

In the Los Angeles telephone case the sole finding of fact was that the city authorities had established a telephone rate which was confiscatory. On this alone it was held that the city violated the Fourteenth Amendment. There could be no finding that the law authorizing the rate fixing was not "fair on its face." Nor was there any finding of the city's purposeful discriminatory design to favor one individual or class over another.

Screws v. United States, 325 U.S. 91, 103, 65 S.Ct. 1031, 89 L.Ed. 1495, 162 A.L.R. 1330, upholds the validity of the twin section 19 of the Criminal Code against the charge of a vagueness so complete that it fails to describe a crime, by construing it to apply only where (at page 107 of 325 U.S., at page 1038 of 65 S.Ct.) the parties

charged "had the purpose to deprive the prisoner of a constitutional right," there "the right to be tried by a court rather than by ordeal." "For the specific intent required by the Act is an intent to deprive a person of a right which has been made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them." Page 104 of 325 U.S., at page 1037 of 65 S.Ct.

In three respects the instant case is even stronger than the Screws case. There the killing of the prisoner was held no more than a possible violation of the Fourteenth Amendment and punishable in the federal courts though also punishable under the state law. There the law under which the arrest was made was "fair on its face" and the case was returned to the jury to be tried under a proper instruction as to whether the "intent" with which the killing was committed was to violate that Amendment. Here the regulation shows "on its face" the denial of equal protection of the California laws, prevention of which is the very purpose of that Amendment. Here the "intent" so to deny such protection by the enforcement of the regulation is proclaimed in the briefs to this court.

(3) Since the applicable criterion is whether the segregating regulation of each district is discriminatory and not fair on its face, it is pertinent that they clearly fail even to give equal facilities to the children in the two classes of schools.

The teacher of a class of both English and non-English speaking pupils is not the same facility to the English speaking pupils that the same teacher would be to a class made up entirely of those speaking English. There is diverted to the teaching of English to the Spanish speaking pupils much of the teacher's professional energy and time which otherwise would be given to an English speaking class. The district court inferentially so holds in its finding XI,

"English language deficiencies of *some* of the children of Mexican ancestry as such children enter elementary public school life as beginners may justify differentiation by public school authorities in the exercise of their reasonable discretion as to the pedagogical methods of instruction to be pursued with different pupils, and foreign language handicaps may be to such a degree in the pupils in elementary schools as to require separate treatment in separate classrooms * * * Omnibus segregation

of children of Mexican ancestry from the rest of the student body in the elementary grades in the schools involved in this action because of language handicaps is not warranted by the record before us." (Emphasis supplied.)

This court judicially is aware that a century ago when California was taken over by the United States, the majority of its population was Mexican. Four generations of these people have been educated in English speaking schools. To these should be added the third and second generations of succeeding Mexican immigrants to California. A very large percentage of the present day school children descended from Mexican nationals is English speaking. Many of those of older established families do not speak Spanish. All such children are discriminated against by the impaired facility of the teacher, occupied with teaching English to their classroom associates—as compared with those attending schools of English speaking pupils.