Joe R. ROMERO et al., Plaintiffs,
v.
Guy WEAKLEY et al., Defendants.

R. J. BURLEIGH et al., Plaintiffs,
v.
Guy WEAKLEY et al., Defendants.
Nos. 1712–SD, 1713–SD.

United States District Court
S. D. California, S. D.
May 5, 1955.

819

Richard W. Petherbridge, El Centro, Cal., Charles B. Johnson, Pasadena, Cal., Franklin H. Williams, San Francisco, Cal., Byron F. Lindsley, San Diego, Cal., Loren Miller, Los Angeles, Cal., Ralph Estrada, Phoenix, Cal., and A. L. Wirin, Los Angeles, Ariz., for plaintiff.

Arthur L. Lockie, Dist. Atty., El Centro, Cal., for defendant.

HALL, District Judge.

By stipulation of the parties in open court these cases were consolidated. The Complaints are practically identical except that in No. 1712–SD the Complaint is brought on behalf of Mexican minors, and in No. 1713–SD the Complaint is brought on behalf of Negro minors. They are cast as class actions, each on behalf of several hundred allegedly similarly situated children.

The defendants are the Superintendent and the several members of the Board of Trustees of the El Centro School District and the Central Union

High School District, and the County Superintendent of Schools of Imperial County (in which the City of El Centro is located), and the several members of the Board of Supervisors of the County of Imperial.

A summary of the Complaint is set forth at length in Appendix I.

In brief, the allegations of the Complaints assert:

That the defendants and each of them, "as officers of the State of California, under color of regulations, custom, or usage," [Par. XXI] "acting with a common plan, design, and purpose, by aiding, abetting and advising and assisting each other in the El Centro School District, the Central Union High School District and in the establishment and authorization of boundaries of elementary school districts in the County of Imperial, have adopted, and do practice ethnic and racial discrimination and segregation by regulation, custom and usage, rules and regulations and orders, in the operation, management and control of their said systems and facilities," [Par. VII] which deprives plaintiffs of their "civil rights, privileges, and/or immunities;" and that "defendants' conduct * * * is illegal and is in violation of plaintiffs' rights and privileges as guaranteed by the Constitution of the United States, and in pursuance of their unlawful conduct to injure and oppress plaintiffs herein in the free exercise and enjoyment of their rights and privileges as secured and guaranteed to them as citizens of the United States by the Constitution of the United States, as particularly provided under the Fourteenth Amendment.[1]

In short, the Complaints claim that the children of plaintiffs, because of their racial characteristics as Mexicans or Negroes, respectively, are discriminated against in the matter of their right to attend unsegregated schools in El Centro. It is what is currently called a "segregation" case.

The Court of its own motion raised the question as to whether or not a three-judge court should be convened under Sections 2281–2284 of Title 28, United States Code Annotated, and on February 9, 1955, made an Order setting that question for hearing on February 17, 1955. [Appendix II].

At the hearing it was specifically declared by counsel for plaintiffs that they were neither attacking any statute of the State of California, nor any order of any administrative board or commission acting under the State statutes, *upon the ground of the unconstitutionality of any State statute.* In fact, it was the express view of plaintiffs' counsel that the statutes of the State of California "enjoin discrimination because of race or because of ethnic consideration." The defendants admit that segregation is not permitted under California law. [Appendix III]. Accordingly, no request was made for the convening of a three-judge court. [Appendix IV].

The defendant officials filed an answer denying the allegations of the Complaint insofar as there was asserted to be any discrimination or segregation, and at the same time filed a Motion to dismiss, or in the alternative, to stay the proceedings.

Before discussing the Motion to dismiss, it is necessary to dispose of the

---

1. The Complaint also alleges that discrimination is practiced by defendants in not having teachers of Negro extraction in the high school and in not employing them in some elementary schools. It is doubtful if plaintiffs can properly present that issue in this action as no person who is a teacher is alleged to be a plaintiff or a member of the class of plaintiffs. But that issue is not reached or resolved inasmuch as it is unnecessary to the present disposition made of the case. It is to be observed also that the

allegations of the complaint are that in the two elementary schools mentioned, (there are six in El Centro), the rules, etc., of defendants exclude *"all but"* children of the Negro race and the Mexican race. Whether the plaintiffs can represent that "all but" class of persons, when none of them are plaintiffs, is likewise not reached or passed upon. Nor is the question as to whether or not those who are Mexicans are of a "race" other than the white race.

Motion of plaintiffs to amend the Complaint.

At the time of the argument of the Motion to dismiss, which was after answer had been filed by the defendants, plaintiffs orally moved to amend their Complaint by adding to Paragraph (6) of the prayer thereof, the following language: "and for damages against each of the defendants in the sum of $5,-000.00," so that Parargaph (6) of the prayer, as so proposed to be amended, would read: "and for such other and further relief as this Court may deem just and proper, and for costs of suit, and for damages against each of said defendants in the sum of $5,000.00."

■ The Complaint is not a complaint for damages. The theory of the action is to be determined by its main and material allegations. First National Bank of Colorado Springs v. McGuire, 7. Cir., 1950, 184 F.2d 620. It is stated in the body of the Complaint that the action is brought under Section 1343(3) of Title 28, United States Code Annotated. [Appendix V]. It sounds in equity. In each of the Complaints it is alleged that the plaintiffs have no plain, speedy or adequate remedy at law. There are no allegations of damage in any sum to any of the plaintiffs except that plaintiffs are "suffering great and irreparable damage." Subdivisions (1) and (2) of 28 U.S.C.A. § 1343 permit actions for damages. This action is brought under neither of those subdivisions, but as noted, is brought under subdivision (3) only.

The individual damage to each plaintiff would have to depend upon the facts and circumstances concerning each plaintiff. As noted, no such allegations are contained in the Complaint. The determination of the damages in a definite sum to each of the named plaintiffs would not determine the damage, if any, to any other member of the class not designated as a named plaintiff. The Complaint is filed as a class suit under Rule 23, Federal Rules of Civil Procedure, 28 U.S.C.A., and if it were a complaint for damages only, it would lose its character as a "class" suit. Matthews v. Rodgers, 284 U.S. 521, at page 530, 52 S.Ct. 217, 76 L.Ed. 447. Cf. Brown v. Board of Trustees of La Grange Ind. School Dist., 5 Cir., 187 F.2d 20—and would pend only on behalf of those joined as plaintiffs under Rule 20, Federal Rules of Civil Procedure.

The Motion of the plaintiffs to amend the Complaint is denied.

I come now to a consideration of the Motion to dismiss, or in the alternative, to stay.

Jurisdiction is not dependent upon diversity or any other ground of Federal jurisdiction, except Section 1343(3) of Title 28, United States Code Annotated.

The formal grounds of the Motion to dismiss are set forth by text in Appendix VI.

Defendants concede that this Court has jurisdiction under the allegations of the Complaint by the provisions of Section 1343(3) of Title 28, United States Code Annotated. It is urged, however, inasmuch as this is an equity case, that— *First*: the Court, in the exercise of its discretion, should decline jurisdiction or stay the proceedings upon the grounds that decision of Federal Constitutional questions should be avoided except where absolutely necessary, which can and should be done in this case by requiring plaintiffs, under the rule of comity between the Federal courts and the several States, to pursue their remedy in the State Courts of California, which are open to them with remedies under State law and which are competent and decision by which is final on questions of purely local law involving the Statutes of California and the rules, regulations, ordinances and conduct of the defendant Boards, which must be applied and construed in this case before any Federal Constitutional question is reached; *Second*: that equitable considerations require the granting of the Motion in that it would be impossible to frame an effective decree without setting this Court up as a continuous and perpetual supervisor of the multitude of duties of the defend-

ant local School Boards and other officials.

Before discussing the first ground of defendants' Motion, it is advisable to consider the second, viz.: the impossibility of framing and enforcing an effective decree in equity without setting this Court up as a continuous and perpetual supervisory school board. In substance the contention is that zones and the establishment of boundary lines for schools, the establishment, maintenance, general conduct thereof, and permission to attend them are influenced by things which are constantly changing and are beyond the control of the defendants, and would be beyond the control of this Court, among which are the tendency of people of the same race to congregate in an area, constantly changing areas of population, the location of dead-end streets, highways, railroads, factories, and the like, and other things involving safety factors.[2] While Giles v. Harris, 1903, 189 U.S. 475, 23 S.Ct. 639, 47 L.Ed. 909 (the principles of which are affirmed but distinguished in Lane v. Wilson, 1939, 307 U.S. 268, 59 S.Ct. 872, 83 L. Ed. 1281), is authority for the proposition that a court of equity would be justified in a Fourteenth Amendment case in declining jurisdiction solely on such ground, it is not necessary to rest the decision herein on that ground alone, as the Motion to stay is disposed of on the first ground of the objection. The matters urged in that connection are to be taken into account in the consideration of the first ground of objection, to which I shall now turn.

■ At the outset it should be observed that this Court is aware that the "separate but equal" doctrine of Plessy v. Ferguson, 1896, 163 U.S. 537, 16 S.Ct. 1138, 1144, 41 L.Ed. 256, no longer controls as to the public schools, but has been expressly overruled by the four cases finding expression in 1953 in the decision of the Supreme Court in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686.

If the latter case were controlling in the instant matter, that would be an end of the question, and the Court would forthwith deny the Motion, as the Brown cases are, and must be regarded as controlling on substantive law. But for reasons concerning the orderly administration of justice in our dual Federal system,[3] which will hereinafter appear, the Brown case is not controlling, and the Motion to stay must be granted.

The Brown case is not applicable or controlling here in that each of the four cases involved, and decided there, were concerned with constitutional or statutory provisions of the several states of Kansas, South Carolina, Virginia and Delaware. There was no need, in those cases, for State interpretation of the State statutes or constitutional provisions since the provisions under consideration there, on their face, required the segregation of Negroes and Whites in public schools. Here, there is no such

2. While some complaint is made about boundary lines, it should be noted that there is no allegation that plaintiffs have complied with the administrative procedure set up in The Education Code of California, Section 2502 et seq., for the change of boundary lines. It should be further noted that the difficulty of framing a decree in favor of plaintiffs is illustrated by the allegations of Paragraph XXIII of the Complaint in No. 1712–SD, which are to the effect that one Ervin is not Mexican or Negro, and goes to the Meadows school, but is entitled to go to the Douglass school, because it is closer, and to have no segregation practiced in the Douglass school. Whether or not the inference should be drawn that the Meadows school has no segregation is not reached.

3. Said Mr. Justice Jackson in Collins v. Hardyman, 1951, 341 U.S. 651, at pages 656, 658, 71 S.Ct. 937, at page 940, 95 L. Ed. 1253: "This decision (U. S. v. Harris, 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290) was in harmony with that of other important decisions during that period by a Court, every member of which had been appointed by President Lincoln, Grant, Hayes, Garfield or Arthur—all indoctrinated in the cause which produced the Fourteenth Amendment, but convinced that it was not to be used to centralize power so as to upset the federal system."

State statute involved, and as hereinbefore indicated, it is the position of the plaintiffs that the State laws of California require non-segregation.

Nor is any specific order, regulation, rule, ordinance or conduct of the defendants County Board of Supervisors or local School Board under attack by the plaintiffs. Nor are any facts alleged showing that a specific statutory duty has been done by the defendants in a discriminatory manner, or is unreasonable. Only a general course of conduct with a claimed result is alleged. This is best pointed up by Paragraphs (1) and (2) of the prayers of the Complaints which read as follows: "Wherefore plaintiffs pray: (1) That said rules, regulations, custom or usage be adjudged void and unconstitutional; (2) That defendants, their servants, agents and employees, be permanently compelled to admit plaintiffs and all persons of Negro extraction to the full use, enjoyment and privilege of attending schools in their respective districts, free from discrimination or segregation." [4]

The instant case is also unlike Westminster School District of Orange County v. Mendez, 9 Cir., 1947, 161 F.2d 774, 781, relied on by plaintiffs, where there was a specific identified order under attack which could be reached by a decree, and which "on its face" required segregation. In that case, incidentally, the question of the exercise of the discretion of the court, pending an opportunity for proceedings in the State court, was not raised or discussed in any of the opinions. The instant case is also unlike, and is distinguished from, the other cases relied upon by the plaintiffs in that in each of them there was a specific order which could be reached by a decree directed against a specific act, rule, regulation, statute, or ordinance. In an examination of the question I have gathered such cases, whether cited or relied upon by either party or not, indicating in each instance the specific statute, or regulation, or single act under attack. None of these cases would have required the continued and perpetual supervisory action which a decree on plaintiffs' complaint would require in this case. Those cases are as follow: United States v. Classic, 1941, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (Criminal case)—Specific act of altering ballots; Willcox v. Consolidated Gas Co., 1909, 212 U.S. 19, 29 S.Ct. 192, 53 L.Ed. 382—A rate order of Gas Commission; Home Telephone & Telegraph Company v. City of Los Angeles, 1913, 227 U.S. 278, 33 S.Ct. 312, 57 L.Ed. 510—An ordinance establishing telephone rates; Railroad & Warehouse Commission of Minnesota v. Duluth Street Ry. Co., 1927, 273 U.S. 625, 47 S. Ct. 489, 71 L.Ed. 807—A rate order of Railroad and Warehouse Commission; Gobitis v. Minersville School District, D.C.1937, 21 F.Supp. 581—A regulation requiring flag saluting in public schools; West Virginia State Board of Education v. Barnette, 1943, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628—A statute and a flag saluting regulation; Lane v. Wilson, 1939, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281—A refusal to register plaintiff as voter; Hague v. Committee for Industrial Organization, 1939, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423—A Municipal ordinance; Alston v. School Board of City of Norfolk, 4 Cir., 1940, 112 F.2d 992, 130 A.L.R. 1506—Alleged discriminatory salary schedules for teachers; Zimmerman v. Village of London, Ohio, D.C.S.D.Ohio, 1941, 38 F.Supp. 582—A Municipal ordinance covering house to house solicitation; Favors v. Randall, D.C.E.D.Penn., 1941, 40 F.Supp. 743—A regulation re certification for occupancy in public housing; Lynch v. City of Muskogee, D.C.E.D.Okl.1942, 47 F. Supp. 589—A City ordinance; Thomas

4. It is noted that the Complaint does not allege that Negroes or Mexicans are excluded from schools attended by White children, but instead, it is alleged that all but Negroes and Mexicans are excluded from certain schools. And as noted, there are no specific rules, regulations, customs, or usage described in the body of the Complaint, so that the "said rules," et cetera, in the prayer are as indefinite as the Complaint.

v. Hibbitts, D.C.M.D.Tenn.1942, 46 F. Supp. 368—Salary schedule for teachers; Meredith v. City of Winter Haven, 1943, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9— Threatened retirement by City of bonds without paying deferred interest coupons; Smith v. Allwright, 1944, 321 U. S. 649, 64 S.Ct. 757, 88 L.Ed. 987—Right of a negro plaintiff to vote in party primary; Picking v. Pennsylvania R. Co., 3 Cir., 1945, 151 F.2d 240—False arrest and imprisonment; Screws v. United States, 1945, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495—Criminal acts of defendant; Thompson v. Gibbes, D.C.E.D.S.C. 1945, 60 F.Supp. 872—Teachers' salary schedules; Bell v. Hood, 9 Cir., 1946, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939— False imprisonment; Burt v. City of New York, 2 Cir., 1946, 156 F.2d 791— Denial of applications of an architect; Mitchell v. Wright, 5 Cir., 1946, 154 F.2d 924—Refusal to register negro to vote; Wrighten v. Board of Trustees, D.C.E.D. S.C.1947, 72 F.Supp. 948—Refusal to provide facilities for legal education of a negro; Rice v. Elmore, 4 Cir., 1947, 165 F.2d 387—Rule of Democratic Party denying negroes right to vote in primaries; Westminster School District of Orange County v. Mendez, 9 Cir., 1947, 161 F.2d 774—Specific order for segregation of Negro and Latin pupils because of language deficiencies without calling for examinations as to those deficiencies; Johnson v. Board of Trustees of University of Kentucky, D.C.E.D.Ky.1949, 83 F.Supp. 707—Specific act of exclusion of negro from graduate school of University; Gonzales v. Sheely, D.C. Ariz.1951, 96 F.Supp. 1004—Order segregating children on alleged basis of language difficulties; Williams v. Kansas City, Mo., D.C.W.D.Mo.1952, 104 F. Supp. 848—Affirmed 8 Cir., 205 F.2d 47 —A refusal of admission to swimming pool; Brown v. Board of Education of Topeka, 1953, 347 U.S. 483, 74 S.Ct. 686 —(Four cases)—In each case there was a specific prohibitory statute or constitutional provision; Wichita Falls Junior College Dist. v. Battle, 5 Cir., 1953, 204 F.2d 632—Exclusion from college be-

cause of race; Lawrence v. Hancock, D. C.S.D.W.Va.1948, 76 F.Supp. 1004— Exclusion from swimming pool; Likewise—Draper v. City of St. Louis, D.C. E.D.Mo.1950, 92 F.Supp. 546; Exclusion from golf courses, see: Holmes v. City of Atlanta, D.C.1954, 124 F.Supp. 290; Hayes v. Crutcher, D.C.M.D.Tenn.1952, 108 F.Supp. 582; Law v. Mayor and City of Baltimore, D.C.D.Md.1948, 78 F.Supp. 346; McKissick v. Carmichael, 4 Cir., 1951, 187 F.2d 949—Segregation required by law but equality of educational facilities provided was in issue. Also, see: Corbin v. County School Board of Pulaski County, Va., 4 Cir., 1949, 177 F. 2d 924, and Carter v. School Board of Arlington County, Va., 4 Cir., 1950, 182 F.2d 531.

Specific acts of exclusion from swimming pools—see: Valle v. Stengel, 3 Cir., 1949, 176 F.2d 697, and Lopez v. Seccombe, D.C.S.D.Cal.1944, 71 F.Supp. 769.

School salary schedule discrimination —see: Morris v. Williams, 8 Cir., 1945, 149 F.2d 703, and Mills v. Board of Education of Anne Arundel County, D.C.D. Md.1939, 30 F.Supp. 245.

As heretofore noted, the defendants concede that this Court has jurisdiction. It is the duty of the Court, however, to first examine the question of jurisdiction. Dinneen v. Williams, 9 Cir., 1955, 219 F.2d 428, at page 430. There can be no doubt in view of the provisions of 28 U. S.C.A. § 1343(3) and the decision of the Ninth Circuit in Westminster School District v. Mendez, supra, that this Court has jurisdiction.

The matter is not put at rest, however, by the mere decision that the Court has jurisdiction.

■■ This is an equity case, and it is one of the primary principles of equity that the Court, while it has jurisdiction, may, in the exercise of sound judicial discretion, decline to exercise it. This is particularly so when the Federal courts are called upon to make a decision of constitutional questions. Pullman, Fieldcrest, Spector and Albertson cases,

post. It has been too long settled and too often repeated by the Supreme Court for any doubt to remain that a cardinal principle guiding the decision of constitutional questions is that a decision will not be made on such a question in advance of the necessity for doing so. Charles River Bridge v. Proprietors of Warren Bridge, 11 Pet. 420, 9 L.Ed. 773; Rescue Army v. Municipal Court, 1947, 331 U.S. 549 et seq., 67 S.Ct. 1409, 91 L. Ed. 1666. A terse expression of the principle is found in Alma Motor Co. v. Timken-Detroit Axle Co., 1946, 329 U.S. 129, at page 136, 67 S.Ct. 231, at page 234, 91 L.Ed. 128, where the Court stated: "If two questions are raised, one of non-constitutional and the other of constitutional nature, and a decision of the non-constitutional question would make unnecessary a decision of the constitutional question, the former will be decided. *This same rule should guide the lower courts as well as this one.*" (Emphasis supplied.)

The principles controlling in this case find their best expression in four cases decided by the Supreme Court, none of which were overruled or modified in the Brown cases. In each one of them the case had proceeded to final decision through the lower courts involving construction or application of State laws or orders or ordinances of State bodies, and when the cases reached the Supreme Court, it remanded the cases to the lower courts with instructions that they be stayed in the Federal court pending an adjudication by the local State courts of the local laws, ordinances, orders, or regulations involved. The cases are: Railroad Commission of Texas v. Pullman Company, 1941, 312 U.S. 496, 61 S. Ct. 643, 85 L.Ed. 971; City of Chicago v. Fieldcrest Dairies, 1942, 316 U.S. 168, 169, 62 S.Ct. 986, 86 L.Ed. 1355; Spector Motor Service, Inc., v. McLaughlin, 1944, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101; Albertson v. Millard, Attorney General of Michigan, 1953, 345 U.S. 242, 73 S.Ct. 600, 97 L.Ed. 983.

The Pullman case, supra, involved civil rights under the Fourteenth Amendment, in connection with an order by the Texas Railroad Commission. A three-judge court was convened, and, at the request of the Railroads and the Pullman Company, enjoined the enforcement of an order issued by the Texas Railroad Commission concerning the personnel on sleeping cars in the State of Texas. The Pullman porters, who were colored, were permitted to intervene as complainants. The Pullman Company and the Railroads assailed the order as unauthorized by Texas law, as well as violative of the equal protection (Fourteenth Amendment), the due process, and the commerce clauses of the Constitution. The intervening Pullman porters adopted these objections, but mainly objected to the order as a discrimination against negroes in violation of the Fourteenth Amendment. At this point, rather than attempt to paraphrase the holding of the Supreme Court, it is best to let the Supreme Court speak for itself, which it did as follows: 312 U.S. 496, commencing at page 498, 61 S.Ct. 643, at page 644—

"The complaint of the Pullman porters undoubtedly tendered a substantial constitutional issue. It is more than substantial. *It touches a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open. Such constitutional adjudication plainly can be avoided if a definitive ruling on the state issue would terminate the controversy.* It is therefore our duty to turn to a consideration of questions under Texas law.

" * * * Reading the Texas statutes and the Texas decisions as outsiders without special competence in Texas law, we would have little confidence in our independent judgment regarding the application of that law to the present situation. The lower court did deny that the Texas statutes sustained the Commission's assertion of power. And this represents the view of an able and experienced circuit judge of the

circuit which includes Texas and of two capable district judges trained in Texas law. Had we or they no choice in the matter but to decide what is the law of the state, we should hesitate long before rejecting their forecast of Texas law. But no matter how seasoned the judgment of the district court may be, it cannot escape being a forecast rather than a determination. *The last word on the meaning of Article 6445 of the Texas Civil Statutes, and therefore the last word on the statutory authority of the Railroad Commission in this case, belongs neither to us nor to the district court but to the supreme court of Texas.* In this situation a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication. Glenn v. Field Packing Co., 290 U.S. 177, 54 S.Ct. 138, 78 L.Ed. 252; Lee v. Bickell, 292 U.S. 415, 54 S.Ct. 727, 78 L.Ed. 1337. *The reign of law is hardly promoted if an unnecessary ruling of a federal court is thus supplanted by a controlling decision of a state court. The resources of equity are equal to an adjustment that will avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication.*

"An appeal to the chancellor, as we had occasion to recall only the other day, is an appeal to the 'exercise of sound discretion, which guides the determination of courts of equity'. Beal v. Missouri Pacific R. Co., [ante] 312 U.S. [at page] 45, 61 S.Ct. 418, 421, 85 L.Ed. [577] * * *. The history of equity jurisdiction is the history of regard for public consequences in employing the extraordinary remedy of the injunction. There have been as many and as variegated applications of this supple principle as the situations that have brought it into play. See, for modern instances, Beasley v. Texas & Pacific Ry. Co., 191 U.S.

492, 24 S.Ct. 164, 48 L.Ed. 274; [City of] Harrisonville v. [W. S.] Dickey Clay Co., 289 U.S. 334, 53 S.Ct. 602, 77 L.Ed. 1208; United States [ex rel. Greathouse] v. Dern, 289 U.S. 352, 53 S.Ct. 614, 77 L.Ed. 1250. Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies, whether the policy relates to the enforcement of the criminal law, Fenner v. Boykin, 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927; Spielman Motor [Sales] Co. v. Dodge, 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322; or the administration of a specialized scheme for liquidating embarrassed business enterprises, [Commonwealth of] Pennsylvania v. Williams, 294 U.S. 176, 55 S.Ct. 380, 79 L.Ed. 841; or the final authority of a state court to interpret doubtful regulatory laws of the state, Gilchrist v. Interborough [Rapid Transit] Co., 279 U.S. 159, 49 S.Ct. 282, 73 L.Ed. 652; cf. Hawks v. Hamill, 288 U.S. 52, 61, 53 S.Ct. 240, 243, 77 L. Ed. 610. *These cases reflect a doctrine of abstention appropriate to our federal system whereby the federal courts, 'exercising a wise discretion', restrain their authority because of 'scrupulous regard for the rightful independence of the state governments' and for the smooth working of the federal judiciary.* See Cavanaugh v. Looney, 248 U.S. 453, 457, 39 S.Ct. 142, 143, 63 L.Ed. 354; Di Giovanni v. Camden [Fire] Ins. Ass'n, 296 U.S. 64, 73, 56 S.Ct. 1, 5, 80 L.Ed. 47. *This use of equitable powers is a contribution of the courts in furthering the harmonious relation between state and federal authority without the need of rigorous congressional restriction of those powers.* Compare 37 Stat. 1013 * * *; Judicial Code, § 24(1), as amended, 28 U.S.C. § 41(1) * * *; 47 Stat. 70, 29 U.S.C.A. §§ 101–115.

"Regard for these important considerations of policy in the administration of federal equity jurisdiction is decisive here. *If there was no warrant in state law for the Commission's assumption of authority there is an end of the litigation; the constitutional issue does not arise. The law of Texas appears to furnish easy and ample means for determining the Commission's authority.* Article 6453 of the Texas Civil Statutes gives a review of such an order in the state courts. Or, if there are difficulties in the way of this procedure of which we have not been apprised, *the issue of state law may be settled by appropriate action on the part of the State to enforce obedience to the order.* Beal v. Missouri Pacific R. Co., supra; Article 6476, Texas Civil Statutes. *In the absence of any showing that these obvious methods for securing a definitive ruling in the state courts cannot be pursued with full protection of the constitutional claim, the district court should exercise its wise discretion by staying its hands.* Compare Thompson v. Magnolia Co., 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876.

"We therefore remand the cause to the district court, with directions to retain the bill pending a determination of proceedings, to be brought with reasonable promptness, in the state court in conformity with this opinion. Compare Atlas Ins. Co. v. W. I. Southern, Inc., 306 U.S. 563, 573, 59 S.Ct. 657, 662, 83 L.Ed. 987, and cases cited." (Italics supplied.)

The Fieldcrest Dairies case, supra, involved an attack upon an ordinance of the City of Chicago respecting the sale of milk and the type of containers in which it could be sold. While in that case there was at the same time pending a case in the State courts, the Supreme Court nevertheless, of its own motion, after the case had been decided by the District Court, 35 F.Supp. 451, appealed, and decided by the Circuit Court of Appeals, 7 Cir., 122 F.2d 132, had the following to say: 316 U.S. commencing at page 171, 62 S.Ct. at page 987—(Emphasis supplied)

" * * * We granted the petition for certiorari * * * because of the doubtful propriety of the District Court and of the Circuit Court of Appeals in undertaking to decide such an important question of Illinois law instead of remitting the parties to the state courts for litigation of the state questions involved in the case. Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971.

"We are of the opinion that the procedure which we followed in the Pullman case should be followed here. Illinois has the final say as to the meaning of the ordinance in question. It also has the final word on the alleged conflict between the ordinance and the state Act. The determination which the District Court, the Circuit Court of Appeals or we might make could not be anything more than a forecast—a prediction as to the ultimate decision of the Supreme Court of Illinois. Here as in the Pullman case 'a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication.' 312 U.S. at page 500, 61 S.Ct. at page 645. Furthermore, the dispute in its broad reach involves a question as to whether a city has trespassed on the domain of a State. Though that issue was not in the case when the complaint was filed, it emerged, due to the passage of the Milk Pasteurization Plant Law, long before the District Court entered its decree. The delicacy of that issue and an appropriate regard 'for the rightful independence of state governments' (Beal v. Missouri Pacific R. Co., 312 U.S. 45, 50, 61 S.Ct. 418, 421, 85 L.Ed. 577) reemphasize that it is a wise and permissible policy for the federal chancellor to stay his hand

in absence of an authoritative and controlling determination by the state tribunals. As we said in the Pullman case, 'The resources of equity are equal to an adjustment that will avoid the waste of a tentative decision' and any 'needless friction with state policies.' See page 500 of 312 U.S., page 645 of 61 S.Ct., and cases cited; Thompson v. Magnolia Petroleum Co., 309 U.S. 478, 483, 484, 60 S.Ct. 628, 630, 631, 84 L.Ed. 876. It is an exercise of a 'sound discretion, which guides the determination of courts of equity'. Beal v. Missouri Pacific R. Co., supra, 312 U.S. at page 50, 61 S.Ct. at page 421. In this case that discretion calls for a remission of the parties to the state courts which alone can give a definitive answer to the major questions posed. Plainly they constitute the more appropriate forum for the trial of those issues. See 54 Harv.L.Rev. 1379. *Considerations of delay, inconvenience, and cost to the parties, which have been urged upon us, do not call for a different result. For we are here concerned with the much larger issue as to the appropriate relationship between federal and state authorities functioning as a harmonious whole.*

"The desirability of the course which we have suggested is not embarrassed by any question as to whether ready recourse may be had to the state courts. The availability of the state tribunal is obvious, since a case involving substantially identical issues and brought by respondent's parent corporation is pending in the state court. Cf. Gilchrist v. Interborough Rapid Transit Co., 279 U.S. 159, 49 S.Ct. 282, 73 L.Ed. 652.

"It is of course true that respondent sought to raise in its complaint a *constitutional* issue—an issue which lurks in the case even though it not be deemed substantial. *But here, as in the Pullman case, that is-*

*sue may not survive the litigation in the state courts. If it does not, the litigation is at an end.* That again indicates the wisdom of allowing the local law issues first to be resolved by those who have the final say. *Avoidance of constitutional adjudications where not absolutely necessary is part of the wisdom of the doctrine of the Pullman case.*

"We therefore vacate the judgment and remand the cause to the District Court with directions to retain the bill pending a determination of proceedings in the state court in conformity with this opinion."

In the Spector Motor case, the suit proceeded to judgment in the District Court, 47 F.Supp. 671, was appealed to the Circuit Court of Appeals, 2 Cir., 139 F.2d 809, was remanded by the Supreme Court, 323 U.S. 101, 65 S.Ct. 152, 89 L. Ed. 101, of its own motion, to the District Court with directions to retain the bill.

It was a suit originally brought to enjoin the enforcement of a State tax and for declaratory judgment in connection with the petitioner's business of interstate trucking. The Supreme Court said: 323 U.S. commencing at page 104, 65 S.Ct. at page 154, 89 L.Ed. 101—(Emphasis supplied)

*"We would not be called upon to decide any of these questions of constitutionality, with their varying degrees of difficulty, if, as the District Court held, the statute does not at all apply to one, like petitioner, not authorized to do intrastate business. Nor do they emerge until all other local Connecticut issues are decided against the petitioner.* But even if the statute hits aspects of an exclusively interstate business, it is for Connecticut to decide from what aspect of interstate business she seeks an exaction. It is for her to say what is the subject matter which she has sought to tax and what is the calculus of the tax she seeks. Every one of these questions must

be answered before we reach the constitutional issues which divided the court below.

"Answers to all these questions must precede consideration of the Commerce Clause. To none have we an authoritative answer. Nor can we give one. Only the Supreme Court of Errors of Connecticut can give such an answer. But this tax has not yet been considered or construed by the Connecticut courts. We have no authoritative pronouncements to guide us as to its nature and application. That the answers are not obvious is evidenced by the different conclusions as to the scope of the statute reached by the two lower courts. The Connecticut Supreme Court may disagree with the District Court and agree with the Circuit Court of Appeals as to the applicability of the statute. But this is an assumption and at best 'a forecast rather than a determination.' Railroad Commission v. Pullman Co., 312 U.S. 496, 499, 61 S.Ct. 643, 645, 85 L.Ed. 971. Equally are we without power to pass definitively on the other claims urged under Articles I and II of the Connecticut Constitution. *If any should prevail, our constitutional issues would either fall or, in any event, may be formulated in an authoritative way very different from any speculative construction of how the Connecticut courts would view this law and its application.* Watson v. Buck, 313 U.S. 387, 401, 402, 61 S.Ct. 962, 966, 967, 85 L.Ed. 1416.

"*If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality* —here the distribution of the taxing power as between the State and the Nation—*unless such* adjudication is unavoidable. And so, as questions of federal constitutional power have become more and more intertwined with preliminary doubts about local

law, we have insisted that federal courts do not decide questions of constitutionality on the basis of preliminary guesses regarding local law. Railroad Commission v. Pullman Co., supra; City of Chicago v. Fieldcrest Dairies, 316 U.S. 168, 62 S.Ct. 986, 86 L.Ed. 1355; In re Central R. Co. of New Jersey, 3 Cir., 136 F.2d 633. See also Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424; Meredith v. [City of] Winter Haven, 320 U.S. 228, 235, 64 S.Ct. 7, 11 [88 L.Ed. 9]; Green v. Phillips Petroleum Co., 8 Cir., 119 F.2d 466; Findley v. Odland, 6 Cir., 127 F.2d 948; United States v. 150.29 Acres of Land, 7 Cir., 135 F.2d 878. *Avoidance of such guesswork, by holding the litigation in the federal courts until definite determinations on local law are made by the state courts, merely heeds this time-honored canon of constitutional adjudication.*

"We think this procedure should be followed in this case. The District Court had jurisdiction to entertain this bill and to give whatever relief is appropriate despite the Johnson Act and Great Lakes Dredge Co. v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407, because of the uncertainty surrounding the adequacy of the Connecticut remedy. See Waterbury Savings Bank v. Lawler, 46 Conn. 243; Wilcox v. Town of Madison, 106 Conn. 223, 137 A. 742. *But there is no doubt that Connecticut makes available an action for declaratory judgment for the determination of those issues of Connecticut law involved here.* Charter Oak Council, Inc., v. Town of New Hartford, 121 Conn. 466, 185 A. 575; Conzelman v. City of Bristol, 122 Conn. 218, 188 A. 659; Walsh v. City of Bridgeport, 2 Conn.Supp. 88.

"We therefore vacate the judgment of the Circuit Court of Appeals and remand the ?ause to the

District Court with directions to retain the bill pending the determination of proceedings to be brought with reasonable promptitude in the state court in conformity with this opinion."

In the Albertson case, supra, the State of Michigan enacted a Communist Control Act which was challenged by the Communist Party of Michigan and Wilbur Albertson, its Executive Secretary, in the District Court on the grounds of unconstitutionality. After action by the District Court, 106 F.Supp. 635, an appeal was taken directly to the Supreme Court where it disposed of the case in the following language: 345 U.S. commencing at page 244, 73 S.Ct. at page 602—(Emphasis supplied.)

"* * * Interpretation of state legislation is primarily the function of state authorities, judicial and administrative. The construction given to a state statute by the state courts is binding upon federal courts. There has been no interpretation of this statute by the state courts. The absence of such construction stems from the fact this action in federal court was commenced only five days after the statute became law.

"There is pending in the Circuit Court for Wayne County, Michigan, a bill seeking a declaratory judgment that the Act is unconstitutional, both on federal and state grounds. That action is being held in abeyance pending our mandate and decision in this case.

"We deem it appropriate in this case that the state courts construe this statute before the District Court further considers the action. See Rescue Army v. Municipal Court, 1947, 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666; American Federation of Labor v. Watson, 1946, 327 U.S. 582, 66 S.Ct. 761, 90 L.Ed. 873; and Spector Motor Service v. McLaughlin, 1944, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101.

"The judgment is vacated and the cause remanded to the District Court for the Eastern District of Michigan with directions to vacate the restraining order it issued and to hold the proceedings in abeyance a reasonable time pending construction of the statute by the state courts either in pending litigation or other litigation which may be instituted."

Plaintiffs at the hearing urged that any stay of proceedings might result in a delay and inconvenience to the parties by compelling them to litigate it in the State court. But that matter was likewise urged upon the Supreme Court in the Pullman case, supra, and in the case of Alma Motor Co. v. Timken-Detroit Axle Co., 1946, 329 U.S. 129, 67 S.Ct. 231, 91 L.Ed. 128, which had proceeded to judgment in the District Court, 47 F.Supp. 582, and on through appeal to the Circuit Court of Appeals, 3 Cir., 144 F.2d 714, and certiorari granted by the Supreme Court. While the Alma Motor case differed from this inasmuch as it involved the constitutionality of an Act of Congress, nevertheless the Court applied the same principles as have been hereinabove indicated, and as to the delay, had the following to say: 329 U.S. at page 142, 67 S.Ct. at page 236—

"* * * We agree that much time has been wasted by the earlier failure of the parties to indicate, or the Circuit Court of Appeals or this Court to see, the course which should have been followed. This, however, is no reason to continue now on the wrong course. The principle of avoiding constitutional questions is one which was conceived out of considerations of sound judicial administration. It is a traditional policy of our courts."

Other cases to the same effect are: Alabama State Federation of Labor v. McAdory, 1945, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725; Rescue Army v. Municipal Court, 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666; Stainback v. Mo

Hock Ke Lok Po, 1949, 336 U.S. 368, 69 S.Ct. 606, 93 L.Ed. 741.

In Wilson v. Beebe, D.C.Del.1951, 99 F.Supp. 418, a three-judge court stayed proceedings in a school segregation case, even though in that case there was a direct attack upon specific and identified provisions of the Delaware Constitution and Statutes. And in Brown v. Board of Trustees of La Grange, etc., 1951, 187 F.2d 20, the Fifth Circuit dismissed a school segregation case and held that an injunction requiring detailed and continuous supervision of a local school board is not congenial to equitable principles and practices, and will usually not be granted.

The plaintiffs rely upon the case of Meredith v. City of Winter Haven, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9. But that case is to be distinguished from the instant case inasmuch as jurisdiction there depended upon diversity of citizenship, and the court held that jurisdiction in the Federal courts in such a case was to be exercised at the option of the suitors, and did not lie in the discretion of the court. It expressly affirmed Railroad Commission v. Pullman Company, supra, but held that it was not applicable.

The principles announced in the foregoing cases are applicable and controlling in the present case. While here we have no State statute directly involved, we nevertheless have what plaintiffs call, but do not identify, rules, regulations, orders, and conduct, by lawfully created State agencies,—the School Boards and the County Board of Supervisors—which are authorized to conduct their business by rules, regulations, orders and ordinances.

■ Some suggestion was made in the briefs and argument that there is no Constitutional question involved in a suit under 28 U.S.C.A. § 1343(3). Such is not the case as 28 U.S.C.A. § 1343(3) is merely a jurisdictional procedural device. The rights mentioned therein are to be measured by the Fourteenth Amendment to the United States Constitution, or by the Acts of Congress. And, as seen from the quoted portions of the Complaint, the plaintiffs allege the rules, et cetera, of defendants to be in violation of the Fourteenth Amendment. The constitutional question is thus clearly postured by plaintiffs' complaint *after, and only after,* the applicable rules, regulations, orders, customs, usage, or ordinances have been ascertained, construed, interpreted, and applied, and their effect determined.

It is inescapable that the heart of the issue in this case, as postured by plaintiffs' complaint, is whether or not the rules, regulations, orders, custom, usage, or ordinances adopted, practiced, and followed by defendants result in segregation and discrimination; and, it is equally inescapable that a court must find out *what* they are, inasmuch as plaintiffs have not identified them, or any of them, and that then the court must *construe them and determine as a matter of law if their legal operation and effect truly compel the alleged segregation and discrimination. The ultimate thing to be resolved is the legal construction and effect of the rules, regulations, et cetera, of the defendant boards. Their validity, construction, and effect are questions which this Court of equity, in the exercise of discretion and out of a " 'scrupulous regard for the rightful independence of the state governments' and for the smooth working of the federal judiciary",* (Pullman case, supra [312 U.S. 496, 61 S.Ct. 645]) *should leave to the State courts of California.*

There is no allegation that the California courts are not open and available to plaintiffs, and none that such courts are not competent. The California laws provide adequate methods of procedure for a class action, Cal.C.C.P. § 382, [Appendix VII] to secure relief either by declaratory judgment, Cal.C.C.P. § 1060, [Appendix VIII], or by mandamus, Cal. C.C.P. § 1085, [Appendix IX], or by injunction, Cal.C.C.P. § 526(1), [Appendix X].

■ If such proceedings are brought in the California courts, and if, as both parties claim, segregation is prohibited by California law, then plaintiffs may

have their relief if there is segregation in fact, *and the Federal Constitutional question will never arise,* and the Federal courts will not be called upon to touch the "sensitive area of social policy upon which the federal courts ought not to enter unless no alternative" to the adjudication of a Federal constitutional question is open. Pullman case, supra, 312 U.S. at page 498, 61 S.Ct. at page 644.

Of equal dignity and force with the provisions of the Fourteenth Amendment are those provisions of the Constitution which preserve the dual Federal system,—a system which was described by Chief Justice Chase in Texas v. White, 1868, 7 Wall. 700, at page 725, 19 L.Ed. 227, as "an indestructible union of indestructible states."

It is a necessary corollary of that proposition that the federal courts should approach with caution, and avoid if possible, a decision on constitutional questions involving local social issues and policies, when the result would be to tend to destroy the historic powers of the several states.

■ The matter of the provision, maintenance and conduct of schools for the education of children has from the founding of the country been of local concern. It is, and has been, primarily the responsibility of the parents. They in turn have usually delegated it to local boards created and operating under State law. The local boards are selected by the local citizens whose children must attend the schools, with the idea that such boards are familiar with and can best handle the myriad of problems that confront each community, and which are as varied as the geography of the community, or the make-up of its population. It is so in California where there are almost 2,000 separate school districts maintaining and operating many thousands of local schools. In Imperial County alone there are thirty separate school districts and forty-two separate schools.

To proceed to the exercise of jurisdiction on the basis of the general and unspecific allegations in this case, with no charge or showing of any kind that plaintiffs can get no relief in the State courts of California, or that the State courts of California are incompetent, or that they refuse to enforce what plaintiffs say is plainly the law, would be in effect to remove the conduct of schools from locally elected representatives, removable by the local citizens if unsatisfactory, and put that conduct into the hands of the different Judges in each federal judicial district, who are appointed for life by an appointing power not responsive to the will of the local citizens of the school district, and would thus, as surely as a Constitutional amendment, destroy the local powers of the States and of their citizens in the regulation and conduct of their schools, which is one of the remaining important powers of the various States, as sovereign units in the "indestructible union of indestructible states."

Only when, and if, a Federal constitutional question becomes inevitable of decision should a Federal Court exercise its jurisdiction. That is not the present posture of this case. It was the posture of the cases culminating in Brown v. Topeka, supra.

The case is ordered stayed, but the bill is retained to give plaintiffs an opportunity to secure a determination of these questions in the State courts of California.

#### Appendix I

The Complaint in case No. 1712–SD is used for the purpose of this summary.

The first five allegations of this Complaint charge in substance the official capacities of the various defendants, and that the El Centro School District maintains public elementary schools, and that the Central Union High School District maintains a public high school. The sixth paragraph alleges that the defendant Board of Supervisors of the County of Imperial has the duty and power of determining boundaries of the elementary school districts within the County of Imperial, and that the Superintendent of Schools of the County has the power

and duty to receive and examine petitions for changes of boundaries for elementary school districts within the County. The seventh paragraph charges that the defendants, and each of them, "acting with a common plan, design and purpose, by aiding, abetting and advising and assisting each other in the El Centro School District, the Central Union High School District, and in the establishment and authorization of boundaries of elementary school districts in the County of Imperial, have adopted, and do practice ethnic and racial discrimination and segregation by regulation, custom and usage, rules and regulations and orders, in the operation, management and control of their said systems and facilities, as hereinafter stated.

It is further alleged in this paragraph that pursuant to this conspiracy, the defendants have by their regulations, customs and usage, adopted and declared that all elementary schools located east of a certain street within the City of El Centro and within the El Centro School District shall be attended exclusively by children and persons of the Negro race and of Mexican descent, and that children of such races have thereby been segregated and required to attend certain schools within the District, which are reserved for and attended solely and exclusively by the children of the Negro race and Mexican descent. It is additionally alleged in this paragraph that competent and qualified Negro teachers are employed in such elementary schools, but they are by system and design excluded from teaching elsewhere within the City, both in the elementary schools and the high school.

The eighth paragraph recites the execution of such rules and regulations.

The ninth paragraph recites the citizenship and residence of the various plaintiffs.

The tenth through the twenty-fourth paragraphs recite the claims of discrimination on behalf of the respective plaintiffs.

The tenth paragraph is exemplary of these several paragraphs, with the exception of the twenty-third, and reads as follows:

"Plaintiff Joe Romero is the father and next of friend of Eleanor Flora Romero, Frank Romero and Patricia Romero; they live and reside in the Central Union High School District and in the El Centro School District; said Eleanor Flora Romero is a minor and is enrolled in the Central Union High School and is subject to said rules and regulations of said District, and is denied the right to be instructed in a public school which does not systematically exclude from its faculty competent and qualified persons of the Negro race; said Frank Romero is a minor and is enrolled in the Douglass Elementary School, located east of 4th Street within said El Centro School District; said Patricia Romero is a minor and is enrolled in the Washington Elementary School, similarly located east of 4th Street within said El Centro School District. Both of said children are subject to said rules and regulations of said District and the boundary determinations made by the Board of Supervisors of the County of Imperial, and are segregated and required to attend schools which exclude all but children and persons of the Negro race and of Mexican descent."

In the twenty-third paragraph there is a charge that a child not of the Negro race, or of Mexican descent, residing on a highway at a point closer to a school attended exclusively by Negroes and Mexicans than to another school, was not permitted to attend the former school, the one exclusively limited to Negroes and Mexicans, though it was the desire of his parents that he do so, and that the child was denied such right by virtue of the boundary determinations by the defendants.

The twenty-fifth paragraph alleges the beneficial interest of each plaintiff and his or her right to attend the schools in

the District without discrimination or segregation because of race.

The twenty-sixth paragraph alleges again the purported discriminatory practices of the defendants, without alleging any specific acts or regulations of the defendants, other than that the alleged discriminatory result was achieved.

The twenty-seventh paragraph alleges that petitions to the El Centro Board of Trustees and the Central Union School Board of Trustees and the Board of Supervisors of the County to terminate the alleged discriminatory practices were denied.

The twenty-eighth paragraph asserts that plaintiffs seek to redress the deprivation by defendants, as officers of the State of California, under color of regulation, custom, or usage, of plaintiffs' civil rights, privileges and/or immunities secured to them by the laws of the United States.

The twenty-ninth and thirtieth paragraphs allege the illegality and unconstitutionality of the conduct, regulations, custom and usage of the defendants.

The thirty-first paragraph alleges that this is a class action.

The thirty-second paragraph alleges jurisdiction under Section 24 of the Judicial Code of the United States [28 U.S.C.A. § 1343(3)].

The thirty-third paragraph alleges that plaintiffs have no plain, speedy, or adequate remedy at law; and that they are suffering great and irreparable damage.

### Appendix II

*Text of Order of February 9, 1955*

"Complaints were filed in each of the above-entitled matters seeking injunctive relief, against the defendants who are officers or members of the Board of Education of the El Centro School District and Central Union High School District in Imperial County, in connection with the alleged denials of civil rights to the plaintiffs arising out of the alleged discrimination on account of race and color in the conduct of the schools involved. Plaintiffs ask in each case for an Order to Show Cause directed against the defendants, their agents and employees why an injunction pendente lite should not be granted.

"The plaintiffs did not ask for the creation of a three-judge District Court under the terms and provisions of Title 28, U.S.C.A.; Sections 2281 and 2284.

"It is the duty of this Court, however, to determine in the first instance whether or not jurisdiction exists in the District Court by single district judge or a three-judge District Court is required to be created under the sections of the judicial code above mentioned.

"In the event a three-judge Court is required, certain procedures must be followed, which include notification of the Chief Judge of the Ninth Circuit, who shall designate two other judges, at least one of whom shall be a Circuit Judge to sit with the original District Judge. In such an event the convenience of the calendars of the other judges so designated must be taken into consideration in fixing a return date on an Order to Show Cause if one is entitled to be issued.

"It is, thus, initially necessary to determine whether or not a three-judge Court shall be created, and the parties are entitled to be heard in that respect before a determination can be made on whether or not an Order to Show Cause shall be issued, and if it is determined that one is entitled to be issued, to fix a return date.

"It Is Therefore Hereby Ordered that the matter is set on the calendar of this Court for Thursday, February 17, 1955, at the hour of 10 o'clock a. m., at which time the parties through their counsel will present their views as to whether or not the two actions are such as to require the creation of a three-judge District Court under Title 28, U.S.C.A. Sections 2281 et seq.

"Attention of counsel is called to the fact that in each of the cases involved in McLaurin v. Oklahoma State Regents, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149, and in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, three-judge courts were invoked, and that in Mendez v.

Westminster School Dist., D.C., 64 F. Supp. 544, and Westminster School Dist. v. Mendez, 9 Cir., 161 F.2d 774, the question was not discussed. Attention of counsel is also called to the case of Wichita Falls etc. v. Battle, 5 Cir., 1953, 204 F.2d 632.

"Dated this 9th day of February, 1955, at San Diego. California.

S/ Peirson M. Hall
United States District Judge."

(From Defendants' brief)

Appendix III

"History of Legislation With Respect to Segregation in California

"In 1870, the State Legislature enacted the School Law [Stats. 1869–1870, p. 838], which read in part as follows:

'Sec. 53. Every school * * * shall be open for the admission of all *white* children between five and twenty-one years of age residing in that school district. * * *

'Sec. 56. The education of children of African descent, and Indian children, shall be provided for in separate schools. * * *.'

"In Ward v. Flood, 1874, 48 Cal. 36, segregation of Negro school children in the schools of the city and county of San Francisco was held to be constitutionally permissible under the principle of 'separate but equal facilities,' discussed more fully below.

"Following this decision, however, the School Law (which had been codified as part of the Political Code) was amended in 1880 by omitting the word 'white' before 'children' in what was formerly Section 53, above; and by repealing what was formerly Section 56, requiring segregation. (Code Amendments of 1880, p. 47). In 1885, the Supreme Court considered these amendments, and held that a Chinese child of school age could not legally be denied admission to the public schools for racial reasons, pursuant to a rule of the San Francisco board of education, saying (with reference to Political Code Sec. 1667, based on Section 53 above, as amended):

" 'As amended, the clause is broad enough to include all children who are not precluded from entering a public school by some provision of law. And we are not aware of any law which forbids the entrance of children of any race or nationality. The legislature not only declares who shall be admitted, but also who may be excluded, and it does not authorize the exclusion of any one on the ground upon which alone the exclusion of the respondent here is sought to be justified. * * * The board of education has the power "to make, establish, and enforce all necessary and proper rules and regulations *not contrary to law,*" and none other. * * * Teachers cannot justify a violation of law on the ground that a resolution of the board of education required them to do so.' Tape v. Hurley, 1885, 66 Cal. 473, 474–475, 6 P. 129. (Italics supplied.)

"In 1885, following this decision, the legislature again amended the statutes to expressly authorize school districts 'to establish separate schools for children of Mongolian or Chinese descent.' [Stats. 1885, ch. 117, p. 100].

"In 1888, the Visalia board of education established a segregated public school for Negro children exclusively. In directing that a writ of mandate be issued to compel the school district to admit a colored pupil to a 'white' school, the California Supreme Court reviewed the legislative history summarized above, and concluded:

" 'If the people of the state desire separate schools for citizens of African descent and Indians, their wish may be accomplished by laws enacted by the law-making department of the government in accordance with existing constitutional provisions. But this course has not been pursued, as the law now stands; and the powers given to boards of education and school trustees, under section 1617 of the Political Code, do not include the right

claimed by the board of education of Visalia.' Wysinger v. Crook-shank, 1890, 82 Cal. 588, 594, 23 P. 54, 56.

"Following this decision, the legislature, in 1893, authorized school districts to establish 'separate schools for Indian children' in addition to children of Mongolian or Chinese descent. [Stats. 1893, ch. 193, p. 253]. In 1921 this authority was extended further to include children of Japanese parentage. [Stats. 1921, ch. 685, p. 1160]. In Piper v. Big Pine School District, 1924, 193 Cal. 664, 671, 226 P. 926, 929, the Supreme Court declared these statutory provisions to be valid, provided the segregated schools 'are equal in every substantial respect with those furnished for children of the white race.' But, said the court:

"'No separation can be had * * in the absence of statutory or constitutional authority therefor.'

"In 1947 the statutes authorizing segregation of Indian, Chinese, Mongolian and Japanese school children was repealed. [Stats.1947, ch. 737, p. 1792]. Since that time there has existed in California no authority for school districts to segregate school children for reasons of racial or religious differences. On the contrary, the declared legislative policy appears to squarely oppose segregation, as shown by the express authority for school districts to admit as pupils children of Mexican nationals. [Educ.Code, Sec. 16004]. Under the cited decisions, therefore, any such segregation would today be illegal and unauthorized.—Westminster School District v. Mendez, 9 Cir., 1947, 161 F.2d 774.''

### Appendix IV

*Text of Memorandum of February 17, 1955.*

"The matter came on for hearing pursuant to the Order of the Court on the question as to whether or not a three-judge court should be convened under the provisions of Title 28, Section 2281, of the United States Code.

"Counsel for both sides filed points and authorities, argued the matter and agreed that Section 2281 was not applicable.

"The complaints do not seek to enjoin the enforcement, operation or execution of any statute of the State of California, or of an order made by an administrative board or commission acting under any statute of the State of California upon the ground of the unconstitutionality of any statute of the State of California.

"A three-judge court is thus not required under the provisions of said action, and this district court by a single judge has jurisdiction.

"Counsel for plaintiffs agreed that the Court may disregard requests of plaintiffs for an Order to Show Cause.

"Counsel for plaintiffs withdrew their motion for depositions to be taken within twenty (20) days after commencement of the action.

"Dated at San Diego, California, this 17th day of February, 1955.

S/ Peirson M. Hall
United States District Judge.''

### Appendix V

*Section 1343, Title 28, United States Code Annotated—*

"District Courts; Jurisdiction

"§ 1343. Civil rights

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

"(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 47 of Title 8;

"(2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 47 of Title 8 which he had knowledge were about to occur and power to prevent;

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured

by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States. June 25, 1948, c. 646, 62 Stat. 932."

## Appendix VI

*Formal grounds of Motion to Dismiss—*

"(a) Plaintiffs have an adequate remedy at law under the laws of the State of California.

"(b) The allegations of plaintiffs' complaints and the relief prayed for therein require this Court to construe California law, to-wit: to pass upon the meaning, construction, and application of certain rules and regulations of the Board of Trustees of the Central Union High School District, and of El Centro School District, in the County of Imperial, State of California, and certain regulations and resolutions of the Board of Supervisors of said County of Imperial, and that such meaning, construction, and application must be determined in the courts of the State of California prior to any consideration thereof by the Federal Courts of the United States.

"(c) The allegations of plaintiffs' complaints and the relief prayed for therein require this Court to pass upon issues which are purely factual in nature, to-wit: the existence of rules, regulations, customs or usage, and other questions of fact, the existence of which must be determined before any constitutional issue is presented under the Constitution of the United States, and if found nonexistent, will obviate the necessity of any hearing before the Federal Courts of the United States."

## Appendix VII

*California Code of Civil Procedure—*
"Parties to Civil Actions

"§ 382. Joinder of persons united in interest; non-consent to joinder as plaintiff; representative actions

"Parties in interest, when to be joined. When one or more may sue or defend for the whole. Of the parties to the action, those who are united in interest must be joined as plaintiffs or defendants; but if the consent of any one who should have been joined as plaintiff cannot be obtained, he may be made a defendant, the reason thereof being stated in the complaint; and when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the Court, one or more may sue or defend for the benefit of all. (Enacted 1872.) Derivation: Stats.1851, c. 5, p. 52, § 14."

## Appendix VIII

*California Code of Civil Procedure—*
"Declaratory Relief

"§ 1060. Right of action; actual controversy; scope; effect of declaration

"Any person interested under a deed, will or other written instrument, or under a contract, or who desires a declaration of his rights or duties with respect to another, or in respect to, in, over or upon property, or with respect to the location of the natural channel of a water course, may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an action in the superior court for a declaration of his rights and duties in the premises, including a determination of any question of construction or validity arising under such instrument or contract. He may ask for a declaration of rights and duties, either alone or with other relief; and the court may make a binding declaration of such rights or duties, whether or not further relief is or could be claimed at the time. The declaration may be either affirmative or negative in form and effect, and such declaration shall have the force of a final judgment. Such declaration may be had before there has been any breach of the obligation in respect to which said declaration is sought. (Added Stats.1921, c. 463, p. 689, § 1.)"

## Appendix IX

*California Code of Civil Procedure—*
"Writ of Mandate

"§ 1085. Courts which may issue writ; parties to whom issued; purpose of writ

"It may be issued by any court, except a municipal or justice court, to any in-

ferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station; or to compel the admission of a party to the use and enjoyment of a right or office to which he is entitled, and from which he is unlawfully precluded by such inferior tribunal, corporation, board or person. (Enacted 1872. As amended Stats.1935, c. 52, p. 386, § 2; Stats.1951, c. 1737, p. 4138, § 148, operative Jan. 1, 1952.)"

Appendix X

*California Code of Civil Procedure—*
"Injunction

"§ 526. Cases in which authorized; restrictions on grant

"An injunction may be granted in the following cases:

"1. When it appears by the complaint that the plaintiff is entitled to the relief demanded, and such relief or any part thereof, consists in restraining the commission or continuance of the act complained of, either for a limited period or perpetually."